## IN RE THE ADOPTION OF BABY Z.
### (SC 15868)
### (SC 15869)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Palmer and McDonald, Js.

476

Argued May 26, 1998—officially released January 26, 1999

*Jane A. Rothchild* and *Jennifer Middleton*, pro hac vice, with whom was *Philip D. Tegeler*, for the appellants in Docket No. 15868, appellees in Docket No. 15869 (petitioners).

*Susan Quinn Cobb*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Carolyn K. Querijero*, assistant attorney general, for the appellee in Docket No. 15868, appellant in Docket No. 15869 (respondent).

*David J. Elliott, John C. Glezen, Allan B. Taylor* and *Lynn A. Kappelman,* filed a brief for the National Association of Social Workers et al. as amici curiae in Docket No. 15869.

*Opinion*

CALLAHAN, C. J. These two appeals arise from an adoption application filed in the Probate Court by the petitioners, Anne and Malinda (hereinafter plaintiffs).[1] The following facts and procedural history are undisputed. The plaintiffs, two unrelated women, have lived together for more than ten years. *In re Baby Z.*, 45 Conn. Sup. 33, 34, 699 A.2d 1065 (1996). Together, they planned for the birth of Baby Z., who was conceived by artificial insemination and born to Anne on May 10, 1992.[2] Id. Since that time, the plaintiffs have shared parental responsibilities for Baby Z. Id.

On November 24, 1993, the plaintiffs submitted an adoption application to the Probate Court for the district of Ledyard.[3] In the application, Anne, acting as Baby Z.'s sole legal parent, petitioned the Probate Court to declare Malinda the adoptive parent of Baby Z. without terminating Anne's parental rights. Id., 34. The Probate Court concluded that the proposed adoption did not comply with any of the existing statutory provisions for adoption and denied the plaintiffs' adoption application. *In re Baby Z.*, Probate Court, district of Ledyard (May 12, 1994) 5.

---

[1] General Statutes § 45a-744 provides in relevant part: "It is the policy of the state of Connecticut . . . to protect the right to privacy of all parties to . . . adoption proceedings . . . ." In accordance with that policy, the real names of the parties involved in these appeals are not disclosed.

[2] The parental rights of Baby Z.'s sperm donor father subsequently were terminated by the Probate Court for the district of Groton on April 6, 1993. *In re Baby Z.*, supra, 45 Conn. Sup. 34 n.1.

[3] Unless otherwise indicated, all references hereafter in this opinion to General Statutes §§ 45a-706 through 45a-764 are to the General Statutes as revised to 1995, which incorporate amendments to those statutes that became effective July 1, 1993, and, therefore, are applicable to the plaintiffs' adoption application.

Pursuant to General Statutes § 45a-186 (a),[4] the plaintiffs appealed from the Probate Court's judgment to the Superior Court.[5] In their appeal, the plaintiffs claimed that the Probate Court had concluded improperly that the adoption statutes did not authorize adoptions in the plaintiffs' circumstances, and that the Probate Court's judgment denying their adoption application "raise[d] serious constitutional problems . . . ."[6] *In re Baby Z.,* supra, 45 Conn. Sup. 38. On appeal, the Superior Court, *Austin, J.,* determined that the proposed adoption would be in Baby Z.'s best interest. Id., 41. The court also concluded that the plaintiffs' application for the adoption of Baby Z. did not fall within any of the three categories of adoptions, i.e., statutory parent,[7] stepparent or blood relative adoptions, permitted by General Statutes § 45a-724 (a).[8] The court further concluded,

[4] General Statutes § 45a-186 (a) provides in relevant part: "Any person aggrieved by any order, denial or decree of a court of probate in any matter, unless otherwise specially provided by law, may appeal therefrom to the Superior Court in accordance with subsection (b) of this section. . . ."

[5] "When entertaining an appeal from an order or decree of a Probate Court, the Superior Court takes the place of and sits as the court of probate." *Kerin v. Stangle,* 209 Conn. 260, 264, 550 A.2d 1069 (1988); *Satti v. Rago,* 186 Conn. 360, 365, 441 A.2d 615 (1982). "In ruling on a probate appeal, the Superior Court exercises the powers, not of a constitutional court of general or common law jurisdiction, but of a Probate Court." *Kerin v. Stangle,* supra, 264; *Slattery v. Woodin,* 90 Conn. 48, 50–51, 96 A. 178 (1915).

[6] Specifically, the plaintiffs maintained that: (1) the proposed adoption was in Baby Z.'s best interests; *In re Baby Z.,* supra, 45 Conn. Sup. 37; (2) the adoption statutes must be liberally construed in the best interests of the child; id.; (3) the proposed adoption could proceed as a blood relative adoption; id., 37–38; (4) the proposed adoption could also proceed through referral to the adoption review board; id.; (5) the proposed adoption could proceed as a stepparent adoption; id., 38; (6) denial of the adoption would raise "serious constitutional problems"; id.; and (7) denial of the proposed adoption "would be inconsistent with the growing trend emerging in other states . . . [to allow] adoptions under similar circumstances." Id.

[7] "Statutory parent" is defined as "the commissioner of children and families or the child-placing agency appointed by the court for the purpose of giving a minor child or minor children in adoption . . . ." General Statutes § 45a-707 (f).

[8] General Statutes § 45a-724 provides: "(a) The following persons may give a child in adoption:

however, that General Statutes § 45a-764[9] gives the adoption review board (board) authority to waive the requirement under § 45a-724 (a) (1) that only a statutory

"(1) A statutory parent appointed under the provisions of section 17a-112, section 45a-717 or section 45a-718 may, by written agreement, subject to the approval of the court of probate as provided in section 45a-727, give in adoption to any adult person any minor child of whom he is the statutory parent; provided, if the child has attained the age of twelve, the child shall consent to the agreement.

"(2) Subject to the approval of the court of probate as provided in section 45a-727, any parent of a minor child may agree in writing with his or her spouse that the spouse shall adopt or join in the adoption of the child; if that parent is (A) the surviving parent if the other parent has died; (B) the mother of a child born out of wedlock, provided that if there is a putative father who has been notified under the provisions of section 45a-716, the rights of the putative father have been terminated; (C) a former single person who adopted a child and thereafter married; or (D) the sole guardian of the person of the child, if the other parent's parental rights have been terminated or the other parent has been removed as guardian of the person before October 1, 1973.

"(3) Subject to the approval of the court of probate as provided in section 45a-727, the guardian or guardians of the person of any minor child who is free for adoption in accordance with section 45a-725 may agree in writing with a blood relative descended from a common ancestor not more than three generations removed from the child that the blood relative shall adopt the child. For the purposes of this subsection 'blood relative' shall include, but not be limited to, the father of an illegitimate child who has been adjudged by a court of competent jurisdiction to be the father of the child, or who has acknowledged his paternity under the provisions of section 46b-172a, with further blood relationship to the child determined through the father.

"(b) If all parties consent to the adoption under subdivisions (2) and (3) of subsection (a) of this section, then the application to be filed under section 45a-727 shall be combined with the consent termination of parental rights to be filed under section 45a-717. An application made under subdivisions (2) and (3) of subsection (a) of this section shall not be granted in the case of any child who has attained the age of twelve without the child's consent."

[9] General Statutes § 45a-764 provides: "Powers of Adoption Review Board. Notice and hearing. (a) Notwithstanding the provisions of section 45a-727, the Adoption Review Board may, upon application, notice and hearing as hereinafter provided, for cause shown that it is in the best interests of the minor child, waive the requirement that the minor child be placed by the commissioner of children and families or a child-placing agency.

"(b) Any judge of probate who has had presented to him an application for adoption which may not proceed because the child has not been so

parent may give a child in adoption to an adult who, like Malinda, is neither the spouse of the child's sole legal parent nor the child's blood relative. Id.; see also General Statutes § 45a-724 (a) (2) (stepparent adoptions); General Statutes § 45a-724 (a) (3) (blood relative adoptions). Observing that stepparent adoptions pursuant to § 45a-724 (a) (2) proceed without disturbing the parental rights of the child's sole legal parent, the Superior Court further concluded that, upon the board's granting of a waiver of the statutory parent requirement of § 45a-724 (a) (1), the proposed adoption could proceed without terminating Anne's parental rights. *In re Baby Z.*, supra, 45 Conn. Sup. 42. The Superior Court, therefore, remanded the case to the Probate Court with direction to submit an application to the board for a waiver of the *statutory parent requirement* of § 45a-724 (a) (1), and thereafter to grant the proposed adoption upon receipt of a waiver. Id., 51–52. Noting that the plaintiffs' adoption application was not being denied, the court concluded that it was not necessary

placed may apply in writing to the Adoption Review Board for a waiver of such requirement.

"(c) Upon receipt of the application, the chairman of the board shall set a time and place for a hearing and cause notice to be sent by registered or certified mail to the judge of probate and to all parties entitled to notice in the adoption proceeding.

"(d) The hearing shall be held not less than ten days nor more than thirty days after the receipt of the application. The parties entitled to notice shall be given notice at least ten days prior to the hearing.

"(e) Any party to the adoption proceedings shall have the right to present such evidence as is deemed necessary and relevant to the board. After hearing the evidence the board may deny the application or approve the application in which case the chairman shall notify the court of probate that the adoption may proceed and that the requirement of placement by the commissioner of children and families or a child-placing agency is waived.

"(f) If the court of probate thereafter grants the adoption application, there shall be included in the decree a finding that the placement requirements of section 45a-727 have been waived by the Adoption Review Board.

"(g) No such waiver may be granted if the board determines that the adoption proceeding would violate the public policy of the state against the obtaining of children by illegal means for adoption purposes."

to address the plaintiffs' constitutional claims at that time. Id., 53.[10]

The Probate Court thereafter submitted a waiver application to the board pursuant to § 45a-764 (b). See *In re Baby Z.*, Superior Court, judicial district of New London at Norwich, Docket No. CV960110941S (September 17, 1997) 10. After a properly noticed hearing, however, the board concluded that it did not have the jurisdiction to consider or the authority to grant the Probate Court's application for waiver of the statutory parent requirement. Id., 10–11. The board consequently denied the court's waiver application. Id.

The plaintiffs subsequently brought two appeals to the Superior Court from the decision of the board: a *probate appeal* to the Superior Court for the judicial district of New London at Norwich pursuant to § 45a-186 (a); and an *administrative appeal* to the same court pursuant to General Statutes § 4-183 (a).[11] The Superior Court, *Handy, J.*, sitting as a court of probate, dismissed the plaintiffs' probate appeal on the grounds that the board's decision did not constitute an order or decree of a court of probate as required by § 45a-186 (a), and consequently was not reviewable as such.

In their administrative appeal from the decision of the board pursuant to § 4-183 (a), the plaintiffs claimed, inter alia, that in denying the waiver application, the board had exceeded its authority and also had deprived

---

[10] The plaintiffs did not appeal from the judgment of the Superior Court regarding the court's conclusion that their adoption application did not fall within any of the three categories of adoption applications authorized by § 45a-724 (a). See part II B of this opinion.

[11] General Statutes § 4-183 (a) provides: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal."

them, and Baby Z., of certain constitutional rights.[12] *In re Baby Z.*, supra, Docket No. CV96 0110941S, 7–8. The Superior Court, *Handy, J.*, concluded that the plaintiffs had failed to brief their constitutional claims, and that, consequently, those claims had been abandoned. Id., 8 n.4. The Superior Court further concluded, however, that the board had jurisdiction to waive the requirement that Baby Z. be placed for adoption by the commissioner of children and families (commissioner) or a child-placing agency, and impliedly concluded that the statutory parent requirement also could be waived. Id., 20. Consequently, the court remanded the case to the board with direction to the board to reconsider the waiver application. Id., 20–21.

Three appeals ensued: (1) the plaintiffs appealed to the Appellate Court from the judgment of the Superior Court dismissing their *probate appeal*; (2) the board appealed to the Appellate Court from the judgment of the Superior Court sustaining the plaintiffs' *administrative appeal*; and (3) the plaintiffs cross appealed from the latter judgment, challenging the court's determination that they had abandoned their constitutional claims. Acting sua sponte, the Appellate Court ordered that the probate and administrative appeals be heard together. We subsequently transferred both of those appeals to this court pursuant to Practice Book § 4023, now § 65-1, and General Statutes § 51-199 (c).

Thereafter, the board moved for the dismissal of the plaintiffs' cross appeal from the judgment of the Superior Court on the ground that the plaintiffs were not

---

[12] The plaintiffs also argued that: (1) the decision of the board "[flew] in the face of a national trend toward allowing unmarried couples to adopt each other's children"; *In re Baby Z.*, supra, Docket No. CV960110941S, 7–8; (2) the board improperly had considered certain evidence; and (3) the board improperly had failed to overrule the appointment by the Probate Court of a guardian ad litem for Baby Z. The Superior Court did not address the plaintiffs' additional claims. Id., 8 n.4.

aggrieved by that decision. See General Statutes § 4-183 (a). The plaintiffs then moved for permission to file a late preliminary statement of issues in order to raise their constitutional claims as alternate grounds for affirmance of the judgment of the Superior Court. See Practice Book § 4013 (a) (1), now § 63-4 (a) (1). We granted both motions.

## I

## THE PROBATE APPEAL

The plaintiffs appeal from the judgment of the Superior Court dismissing their probate appeal from the decision of the board, purportedly pursuant to § 45a-186 (a). Specifically, the plaintiffs maintain that the Superior Court improperly concluded that: (1) the board's order denying the waiver application submitted to the board by the Probate Court is not an "order, denial or decree of a court of probate" as required by § 45a-186 (a); and (2) the board is an "agency" within the meaning of General Statutes § 4-166 (1)[13] of the Uniform Administrative Procedure Act (UAPA) and that a party aggrieved by a final decision of the board may appeal to the Superior Court from that decision pursuant to § 4-183 (a). We disagree with both of these claims.

## A

The plaintiffs first maintain that the Superior Court improperly concluded that a decision of the board does

---

[13] General Statutes § 4-166 provides in relevant part: "(1) 'Agency' means each state board, commission, department or officer authorized by law to make regulations or to determine contested cases, but does not include either house or any committee of the General Assembly, the courts, the Council on Probate Judicial Conduct, the Governor, Lieutenant Governor or Attorney General, or town or regional boards of education, or automobile dispute settlement panels established pursuant to section 42-181;

"(2) 'Contested case' means a proceeding, including but not restricted to rate-making, price fixing and licensing, in which the legal rights, duties or privileges of a party are required by statute to be determined by an agency after an opportunity for hearing or in which a hearing is in fact held, but

not constitute an "order, denial or decree of a court of probate" appealable pursuant to § 45a-186 (a). The powers and responsibilities of the board are governed in relevant part by General Statutes §§ 45a-763[14] and 45a-764. Section 45a-763 provides in relevant part: "(a) An Adoption Review Board is established, to consist of the commissioner of children and families or his designee, the [P]robate [C]ourt administrator or his designee, and an officer of a child-placing agency which is located in the state and licensed by the commissioner of children and families, who shall be appointed by the governor to serve for a term of four years from the date of his appointment. . . . (d) The members of the board shall receive no compensation for their services as such." Section 45a-764 provides in relevant part: "(a) Notwithstanding the provisions of section 45a-727,[15] the

does not include proceedings on a petition for a declaratory ruling under section 4-176 or hearings referred to in section 4-168 . . . ."

[14] General Statutes § 45a-763 provides: "(a) An Adoption Review Board is established, to consist of the commissioner of children and families or his designee, the [P]robate [C]ourt administrator or his designee, and an officer of a child-placing agency which is located in the state and licensed by the commissioner of children and families, who shall be appointed by the governor to serve for a term of four years from the date of his appointment.

"(b) Each designee or officer shall be a person who is familiar with and experienced in adoption procedures, policies and practices.

"(c) The members of the board shall select a chairman from among their membership, who shall serve for a term of two years from his election or until his successor is elected.

"(d) The members of the board shall receive no compensation for their services as such."

[15] General Statutes § 45a-727 (a) (3) provides: "An application for the adoption of a minor child not related to the adopting parents shall not be accepted by the court of probate unless the child sought to be adopted has been *placed for adoption* by the commissioner of children and families or a child-placing agency, except as provided by section 45a-764, and the placement for adoption has been approved by the commissioner or a child-placing agency. The commissioner or a child-placing agency may place a child in adoption who has been identified or located by a prospective parent, provided any such placement shall be made in accordance with regulations promulgated by the commissioner pursuant to section 45a-728. If any such placement is not made in accordance with such regulations, the adoption

Adoption Review Board may, upon application, notice and hearing as hereinafter provided, for cause shown that it is in the best interests of the minor child, waive the requirement that the minor child be *placed* by the commissioner of children and families or a child-placing agency. (b) Any judge of probate who has had presented to him an application for adoption which may not proceed because the child has not been so placed may apply in writing to the Adoption Review Board for a waiver of such requirement. (c) Upon receipt of the application, the chairman . . . shall set a time and place for a hearing and cause notice to be sent . . . to the judge of probate and to all parties entitled to notice in the adoption proceeding. . . . (e) . . . After hearing the evidence the board may deny the application or approve the application . . . ." (Emphasis added.)

Like the board, courts of probate are statutorily created. See, e.g., General Statutes § 45a-18.[16] The similarity, however, ends there. Unlike the members of the board, Probate Court judges are not only elected; General Statutes § 45a-18; but also compensated for their services. General Statutes § 45a-92.[17] Clearly, the board is a different genre from a court of probate. Moreover, "[o]ur courts of probate have a limited jurisdiction and can exercise only such powers as are conferred on them by statute. . . . They have jurisdiction only when the facts exist on which the legislature has conditioned

application shall not be approved by the court of probate." (Emphasis added.)

[16] General Statutes § 45a-18 (a) provides: "There shall be a court of probate in each probate district held by one judge elected by the electors residing in such district at the state election in 1974, and every four years thereafter."

[17] General Statutes § 45a-92 provides in relevant part: "(a) . . . Each person who is a judge of probate . . . shall file with the Probate Court Administrator . . . a sworn statement showing the actual gross receipts and itemized costs of his office and the net income . . . .

"(c) . . . Each judge of probate . . . shall at the time of filing such returns pay to the State Treasurer . . . a percentage of the annual net income from such office based on the following table . . . ."

the exercise of their power." (Internal quotation marks omitted.) *Castro* v. *Viera,* 207 Conn. 420, 428, 541 A.2d 1216 (1988); *Killen* v. *Klebanoff,* 140 Conn. 111, 115, 98 A.2d 520 (1953); *Palmer* v. *Reeves,* 120 Conn. 405, 408–409, 182 A. 138 (1935). " '[A] court which exercises a limited and statutory jurisdiction is without jurisdiction to act unless it does so under the precise circumstances and in the manner particularly prescribed by the enabling legislation.' " *Marcus' Appeal from Probate,* 199 Conn. 524, 528–29, 509 A.2d 1 (1986); *Heiser* v. *Morgan Guaranty Trust Co.,* 150 Conn. 563, 565, 192 A.2d 44 (1963). General Statutes §§ 45a-725, 45a-726a, 45a-727, 45a-730, 45a-732, 45a-733, 45a-736 and 45a-737[18]

---

[18] General Statutes § 45a-725 provides: "A minor child shall be considered free for adoption and the court of probate may grant an application for the appointment of a statutory parent if any of the following have occurred: (a) The child has no living parents; (b) the parents were removed as guardians of the person before October 1, 1973, in accordance with the provisions of Connecticut law in effect before October 1, 1973; (c) all parental rights have been terminated under Connecticut law; (d) (1) in the case of any child from outside the United States, its territories or the Commonwealth of Puerto Rico placed for adoption by the commissioner of children and families or by any child-placing agency, the petitioner has filed an affidavit that the child has no living parents or that the child is free for adoption and that the rights of all parties in connection with the child have been properly terminated under the laws of the jurisdiction in which the child was domiciled before being removed to the state of Connecticut; or (2) in the case of any child from any of the United States, its territories or the Commonwealth of Puerto Rico placed by the commissioner of children and families or a child-placing agency, the petitioner has filed an affidavit that the child has no living parents or has filed in court a certified copy of the court decree in which the rights of all parties in connection with the child have been terminated under the laws of the jurisdiction in which the child was domiciled before being removed to the state of Connecticut, and the child-placing agency obtained guardianship or other court authority to place the child for adoption. If no such affidavit or certified decree has been filed, then termination of parental rights proceedings shall be required in accordance with sections 17a-112, 17a-113, 45a-187, 45a-606, 45a-607, 45a-706 to 45a-709, inclusive, 45a-715 to 45a-718, inclusive, 45a-724 to 45a-737, inclusive, 45a-743 to 45a-757, inclusive, and 52-231a."

General Statutes § 45a-726a provides: "Notwithstanding any provision of sections 4a-60a and 46a-81a to 46a-81p, inclusive, the commissioner of children and families or a child-placing agency may consider the sexual orienta-

## address the powers and responsibilities of a court of probate with respect to the adoption of a minor child.

tion of the prospective adoptive or foster parent or parents when placing a child for adoption or in foster care, as the case may be. Nothing in this section shall be deemed to require the commissioner of children and families or a child-placing agency to place a child for adoption or in foster care with a prospective adoptive or foster parent or parents who are homosexual or bisexual."

General Statutes § 45a-727 provides: "(a) (1) Each adoption matter shall be instituted by filing an application in a court of probate, together with the written agreement of adoption, in duplicate. One of the duplicates shall be sent forthwith to the commissioner of children and families.

"(2) The application shall incorporate a declaration that to the best of the knowledge and belief of the declarant there is no other proceeding pending or contemplated in any other court affecting the custody of the child to be adopted, or if there is such a proceeding, a statement in detail of the nature of the proceeding and averring that the proposed adoption would not conflict with or interfere with the other proceeding. The court shall not proceed on any application which does not contain such a declaration. The application shall be signed by one or more of the parties to the agreement, who may waive notice of any hearing on it. For the purposes of this declaration, visitation rights granted by any court shall not be considered as affecting the custody of the child.

"(3) An application for the adoption of a minor child not related to the adopting parents shall not be accepted by the court of probate unless the child sought to be adopted has been placed for adoption by the commissioner of children and families or a child-placing agency, except as provided in section 45a-764, and the placement for adoption has been approved by the commissioner or a child-placing agency. The commissioner or a child-placing agency may place a child in adoption who has been identified or located by a prospective parent, provided any such placement shall be made in accordance with regulations promulgated by the commissioner pursuant to section 45a-728. If any such placement is not made in accordance with such regulations, the adoption application shall not be approved by the court of probate.

"(4) The application and the agreement of adoption shall be filed in the court of probate for the district where the adopting parent resides or in the district where the main office or any local office of the statutory parent is located.

"(5) The provisions of section 17a-152, regarding placement of a child from another state, and section 17a-175, regarding the interstate compact on the placement of children, shall apply to adoption placements.

"(b) (1) The court of probate shall request said commissioner or a child-placing agency to make an investigation and written report to it, in duplicate, within ninety days from the receipt of such request. A duplicate of the report shall be sent forthwith to the commissioner of children and families.

None of those statutes either authorizes a court of probate to waive the requirement of § 45a-727 (a) (3) that

"(2) The report shall be filed with the court of probate within the ninety-day period. The report shall indicate the physical and mental status of the child and shall also contain such facts as may be relevant to determine whether the proposed adoption will be for the welfare of the child, including the physical, mental, social and financial condition of the parties to the agreement and the natural parents of the child, if known. The report may set forth conclusions as to whether or not the proposed adoption will be for the welfare of the child.

"(3) The report shall be admissible in evidence subject to the right of any interested party to require that the person making it appear as a witness, if available, and subject himself to examination.

"(4) For any report under this section the court of probate may assess against the adopting parent or parents a reasonable fee covering the cost and expenses of making the investigation. The fee shall be paid to the state or to the child-placing agency making the investigation and report, as the case may be, provided the report shall be made within the ninety-day period or other time set by the court.

"(c) (1) Upon the expiration of the ninety-day period or upon the receipt of such report, whichever is first, the court of probate shall set a day for a hearing upon the agreement and shall give reasonable notice of the hearing to the parties to the agreement, the commissioner of children and youth services and to the child, if over twelve years of age.

"(2) At the hearing the court may deny the application, enter a final decree approving the adoption if it is satisfied that the adoption is in the best interests of the child or order a further investigation and written report to be filed, in duplicate, within whatever period of time it directs. A duplicate of such report shall be sent to the commissioner. The court may adjourn the hearing to a day after that fixed for filing the report. If such report has not been filed with the court within the specified time, the court may thereupon deny the application or enter a final decree in the manner provided in this section.

"(3) The court of probate shall not disapprove any adoption under this section solely because of an adopting parent's marital status or because of a difference in race, color or religion between a prospective adopting parent and the child to be adopted or because the adoption may be subsidized in accordance with the provisions of section 17a-117.

"(4) The court of probate shall ascertain as far as possible the date and the place of birth of the child and shall incorporate such facts in the final decree, a copy of which shall be sent to the commissioner of children and families."

General Statutes § 45a-730 provides: "(a) Notwithstanding the provisions of section 45a-727, when the adoption of a minor child born outside the United States or its territories has been finalized in a jurisdiction other than the United States or its territories, and such minor is unable to obtain

a child sought to be adopted be placed for adoption by the commissioner or a child-placing agency, or provides for Probate Court review of a decision of the board. Also, § 45a-727 (a) (3) explicitly refers to § 45a-764, the statute authorizing the board to grant such waivers.

citizenship in the United States because the adoptive parents did not personally see and observe the child prior to or during the adoption proceedings, a petition for validation of such adoption may be filed with a court of probate.

"(b) The petition may be made by an adoptive parent or a duly authorized officer of any child-placing agency.

"(c) The petition shall be filed in the court of probate in which the petitioner resides or in the district in which the main office or any local office of the child-placing agency is located.

"(d) The petition shall be accompanied by an authenticated and exemplified copy of the adoption unless, upon a showing of good cause, the court waives such requirement.

"(e) Upon receipt of the petition the court shall hold a hearing on said petition within forty-five days, and shall order such notice as it may direct.

"(f) The court may validate the adoption of the minor child if it finds after hearing that: (1) The adoption of the minor child born outside the United States or its territories occurred outside the United States or its territories and (2) United States Immigration and Naturalization Services refuses to naturalize said minor because the adoptive parents did not personally see and observe the child prior to or during the adoption proceedings, and (3) it is in the best interest of the minor child.

"(g) Any validation pursuant to a petition filed under this section shall not be construed to validate an adoption otherwise invalid in accordance with the law of the place of adoption."

General Statutes § 45a-732 provides: "A married person shall not adopt a child unless both husband and wife join in the adoption agreement, except that the court of probate may approve an adoption agreement by either of them upon finding that there is sufficient reason why the other should not join in the agreement."

General Statutes § 45a-733 provides: "(a) Notwithstanding the provisions of section 45a-727, in the case of a child sought to be adopted by a stepparent, the court of probate may waive all requirements of notice to the commissioner of children and families and shall waive, unless good cause is shown for an investigation and report, all requirements for investigation and report by the commissioner of children and families or by a child-placing agency. Upon receipt of the application and agreement, the court of probate may set a day for a hearing upon the agreement and shall give reasonable notice of the hearing to the parties to the agreement and to the child, if over twelve years of age.

"(b) At the hearing the court may deny the application, enter a final decree approving the adoption if it is satisfied that the adoption is in the best

Moreover, in cases in which a waiver is granted by the board, § 45a-764 (f) directs the court of probate to include "in the decree [granting the adoption] a finding that the placement requirements of § 45a-727 have been waived by *the Adoption Review Board.*" (Emphasis added.) We conclude, therefore, that the Probate Court does not have jurisdiction to waive the requirement of § 45a-727 (a) that a child sought to be adopted be placed for adoption by the commissioner or a child-placing agency. That decision is left to the board. Thus, the board's denial of the waiver application submitted to it by the Probate Court in connection with the plaintiffs' adoption application does not constitute an "order, denial or decree of a court of probate" as required for an appeal to the Superior Court pursuant to § 45a-186 (a). Consequently, the board's decision was not cognizable in a probate appeal.

B

The plaintiffs also maintain that the Superior Court improperly determined that the board is an "agency" within the meaning of § 4-166 (1) of the UAPA and that an appeal from a final decision of the board may be

interests of the child, or, for good cause shown, order an investigation by the commissioner of children and families or a child-placing agency."

General Statutes § 45a-736 provides: "Any court of probate, as part of its approval of any agreement of adoption or declaration of an intention to adopt, may change the name of the person adopted, as requested by the adopting parent or parents."

General Statutes § 45a-737 provides: "Obliteration of original name on institutional records, new name substituted. Upon the request of an adopting parent of a child adopted under the provisions of section 45a-727, any public or quasi-public institution, including but not limited to schools and hospitals, shall obliterate the original family name of an adopted child and substitute the new name of the child on its records; except that the person in charge of the records may apply to the court of probate having jurisdiction over the adoption and show cause why the name shall not be substituted. The court may grant or deny the order for the substitution of names as it deems to be in the best interests of the child."

taken, if at all, to the Superior Court pursuant to § 4-183 (a) of the UAPA, rather than pursuant to § 45a-186 (a).[19] Section 4-166 (1) provides in relevant part: " 'Agency' means each state board . . . authorized by law . . . to determine contested cases . . . ." Section 4-166 (2) provides in relevant part: " 'Contested case' means a proceeding . . . in which the legal rights, duties or privileges of a party are required by statute to be determined by an agency after an opportunity for hearing or in which a hearing is in fact held . . . ."

"Three criteria are considered in determining contested case status: (1) whether a legal right, duty or privilege is at issue, (2) [that] is statutorily required to be determined by [an] agency, (3) through an opportunity for a hearing . . . . *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, 226 Conn. 792, 800–801, 629 A.2d 367 (1993); *Herman* v. *Division of Special Revenue*, 193 Conn. 379, 382, 477 A.2d 119 (1984)." (Internal quotation marks omitted.) *Board of Education* v. *State Board of Education*, 243 Conn. 772, 780, 709 A.2d 510 (1998). Section 45a-764 (a) authorizes the board "upon application, notice and *hearing* . . . [to] waive the requirement that the minor child be placed by the commissioner of children and families or a child-placing agency." (Emphasis added.) Section 45a-764 (c) requires that "the chairman of the board . . . set a time and place for a hearing and cause notice to be sent by registered or certified mail to the judge of probate and *to all parties entitled to notice in the adoption proceeding*." (Emphasis added.) Section 45a-764 (e) further provides: "Any *party to the adoption*

[19] It is ironic that to support their claim that the Superior Court improperly dismissed their probate appeal pursuant to § 45a-186 (a), the plaintiffs maintain that § 4-183 (a) does not provide a right of appeal to the Superior Court from a decision of the board. In effect, the plaintiffs argue that the Superior Court improperly sustained their administrative appeal pursuant to § 4-183 (a). See part II of this opinion.

*proceedings shall have the right to present such evidence* as is deemed necessary and relevant to the board. . . ."[20] (Emphasis added.) We conclude, therefore, that a proceeding of the board constitutes a "contested case" within the meaning of § 4-166 (2) and that the board is an "agency" within the meaning of § 4-166 (1).

General Statutes § 4-185 (a) provides in relevant part: "This chapter [the UAPA] applies to all agency proceedings commenced on or after July 1, 1989. . . ." Consequently, because the board is an agency within the meaning of § 4-166 (1), a party aggrieved by a final decision of the board may appeal from such decision to the Superior Court pursuant to § 4-183 (a). Accordingly, we affirm the judgment of the Superior Court dismissing the plaintiffs' probate appeal from the decision of the board.

II

THE ADMINISTRATIVE APPEAL

We turn, therefore, to the board's appeal from the Superior Court's judgment sustaining the plaintiffs' administrative appeal and reversing the board's determination that the board lacked jurisdiction over the waiver application that the Probate Court submitted in connection with the plaintiffs' adoption application. The board contends that the Superior Court improperly concluded that § 45a-764 grants the board authority to consider waiver applications that are not supported by an underlying statutory parent adoption agreement pursuant to § 45a-724 (a) (1). The plaintiffs, however, recharacterizing the waiver application submitted to the board by the Probate Court as an application for waiver of the placement requirement of § 45a-727 (a), rather than as an application for waiver of the statutory

---

[20] Moreover, the board held a hearing on the waiver application submitted to it in connection with the plaintiffs' adoption application.

parent requirement of § 45a-724 (a) (1), argue that: (1) § 45a-764 gives the board the jurisdiction to waive the placement requirement of § 45a-727 (a) (3) even if the underlying adoption application is not a statutory parent adoption application pursuant to § 45a-724 (a) (1); (2) § 45a-764 requires that the board waive the placement requirement even without an underlying statutory parent adoption agreement, if such waiver would be in the best interests of the child and not contrary to public policy; and (3) upon receipt of the board's waiver of the placement requirement, the Probate Court will have authority, without a statutory parent having been appointed for Baby Z. at that point, to issue a single order that simultaneously terminates Anne's parental rights, appoints a statutory parent for Baby Z. and declares Anne and Malinda to be Baby Z.'s legal parents. We agree with the board.

As a threshold matter, we determine the applicable standard of review. "Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts." (Internal quotation marks omitted.) *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, 244 Conn. 378, 389, 709 A.2d 1116 (1998); *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, 243 Conn. 635, 642, 708 A.2d 202 (1998); *Dept. of Administrative Services* v. *Employees' Review Board*, 226 Conn. 670, 678, 628 A.2d 957 (1993). "Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social*

*Services,* supra, 389; *Connecticut Light & Power Co.* v.
*Texas-Ohio Power, Inc.,* supra, 642; *Dept. of Adminis-*
*trative Services* v. *Employees' Review Board,* supra,
678. "Furthermore, when a state agency's determination
of a question of law has not previously been subject to
judicial scrutiny . . . the agency is not entitled to spe-
cial deference." (Internal quotation marks omitted.)
*Connecticut Assn. of Not-for-Profit Providers for the*
*Aging* v. *Dept. of Social Services,* supra, 389; *Connecti-*
*cut Light & Power Co.* v. *Texas-Ohio Power, Inc.,* supra,
642; *Dept. of Administrative Services* v. *Employees'*
*Review Board,* supra, 678–79. The board's determina-
tion that § 45a-764 does not provide it jurisdiction over
waiver applications that are not supported by an under-
lying statutory parent adoption agreement has not been
subject previously to judicial review, and is a pure ques-
tion of law involving the interpretation of the relevant
statutory provisions. Consequently, we afford the con-
clusion of the board no special deference.

A

"The adoption of a minor child, and the giving of it
in adoption to persons other than its natural parents,
is a procedure, and creates a status, unknown to the
common law. Being of purely statutory origin, a legal
adoption results if the statutory procedure is followed,
but fails if any essential requirement of the statute is
not complied with." *Goshkarian's Appeal,* 110 Conn.
463, 465, 148 A. 379 (1930). This is because "[o]ur adop-
tion statutes embody significant substantive and proce-
dural requirements that the legislature has mandated
must be met before one may become an adoptive par-
ent. . . . These requirements rest on important public
policies for the protection of all concerned—the child,
the biological parents and the adoptive parents." (Cita-
tion omitted.) *Doe* v. *Doe,* 244 Conn. 403, 453, 710 A.2d
1297 (1998). An overview of the statutory scheme that

governs adoptions in Connecticut, therefore, is necessary to a resolution of the board's claim that it lacked jurisdiction over the waiver application submitted to the board by the Probate Court in connection with the plaintiffs' adoption application.

Section 45a-724 provides in relevant part: "Who may give child in adoption. (a) The following persons may give a child in adoption: (1) A statutory parent appointed under the provisions of section 17a-112, section 45a-717 or section 45a-718 may, by written agreement, subject to the approval of the court of probate as provided in section 45a-727, give in adoption to any adult person any minor child of whom he is the statutory parent . . . . (2) Subject to the approval of the court of probate as provided in section 45a-727, any parent of a minor child may agree in writing with his or her spouse that the spouse shall adopt or join in the adoption of the child; if that parent is (A) the surviving parent if the other parent has died; (B) the mother of a child born out of wedlock, provided that if there is a putative father who has been notified under the provisions of section 45a-716, the rights of the putative father have been terminated; (C) a former single person who adopted a child and thereafter married; or (D) the sole guardian of the person of the child, if the other parent's parental rights have been terminated or the other parent has been removed as guardian of the person before October 1, 1973. (3) Subject to the approval of the court of probate as provided in section 45a-727, the guardian or guardians of the person of any minor child who is free for adoption in accordance with section 45a-725 may agree in writing with a blood relative [of the child] . . . that the blood relative shall adopt the child. . . ."

Section 45a-727 (a) provides in relevant part: "(1) Each adoption matter shall be instituted by filing an application in a court of probate, together with the

written agreement of adoption . . . . (3) An application for the adoption of a minor child not related to the adopting parents *shall not be accepted by the court of probate unless the child sought to be adopted has been placed for adoption by the commissioner of children and families or a child-placing agency, except as provided by section 45a-764,* and the placement for adoption has been approved by the commissioner or a child-placing agency. . . ." (Emphasis added.)

Section 45a-764 (a) authorizes the board, "upon application, notice and hearing . . . [to] waive the requirement that the minor child be *placed* by the commissioner of children and families or a child-placing agency." (Emphasis added.) Section 45a-764 (b) provides that Probate Court judges who are presented "an application for adoption which may not proceed because the child has not been so placed" may apply in writing to the board for waiver of such requirement. Section 45a-764 (g) provides: "No such waiver may be granted if the board determines that the adoption proceeding would violate the public policy of the state against the obtaining of children by illegal means for adoption purposes."

To summarize, four provisions of the adoption statutes are relevant to this appeal. First, § 45a-724 (a) explicitly authorizes only three types of adoption agreements: (1) agreements by which a *statutory parent* agrees to have a minor child adopted by an adult; (2) agreements by which a child's sole legal parent seeks to have the child adopted by that parent's spouse; and (3) agreements by which a guardian of the person of a minor child seeks to have a child free for adoption adopted by a blood relative of the child. Second, § 45a-727 (a) (1) requires that an adoption proceeding be instituted by filing an adoption application "together with the written agreement of adoption," and that the written agreement then be approved by the Probate

Court. Third, § 45a-727 (a) (3) provides that, except as provided in § 45a-764, the Probate Court may not accept an adoption application that seeks to have a child adopted by persons not related to the child unless the child has been placed for adoption with the prospective adoptive parent or parents either by the commissioner or by a child-placing agency, and such placement has been approved by the commissioner or by a child-placing agency. Finally, if the Probate Court lacks authority to accept an adoption application because the *placement* requirement of § 45a-727 (a) (3) has not been satisfied, § 45a-764 (b) provides that the Probate Court may submit an application to the board for waiver of that placement requirement, and § 45a-764 (a) authorizes the board to grant a waiver upon determining that the *waiver of the placement requirement* would be in the best interests of the child and not contrary to public policy. Section 45a-764 makes no mention of a waiver of the statutory parent or statutory parent agreement requirement.

## B

Mindful of the relevant statutory provisions, we turn to the board's claim that § 45a-764 only provides the board with authority to waive the *placement requirement* of § 45a-727 (a) (3) with respect to adoption applications *that are accompanied by a statutory parent adoption agreement* pursuant to § 45a-724 (a) (1). The board's subject matter jurisdiction is circumscribed by the board's enabling legislation. "Administrative agencies [such as the board] are tribunals of limited jurisdiction and their jurisdiction is dependent entirely upon the validity of the statutes vesting them with power and they cannot confer jurisdiction upon themselves." (Internal quotation marks omitted.) *Hunnihan* v. *Mattatuck Mfg. Co.*, 243 Conn. 438, 443–44, 705 A.2d 1012 (1997); *Castro* v. *Viera*, supra, 207 Conn. 428. Resolution of the jurisdictional issue presented in this appeal is,

therefore, a matter of statutory interpretation. In interpreting statutes, we are guided by well established tenets of statutory construction. "[O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." *Poulos* v. *Pfizer, Inc.*, 244 Conn. 598, 605, 711 A.2d 688 (1998); *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 32, 699 A.2d 101 (1997). Moreover, although General Statutes § 45a-706[21] provides that certain adoption statutes, particularly §§ 45a-724 and 45a-727, "shall be liberally construed in the best interests of any child for whom a petition has been filed under said sections," the best interests of a child cannot transcend statutorily defined jurisdictional boundaries. See *Doe* v. *Doe*, 244 Conn. 403, 423, 710 A.2d 1297 (1998) (court lacks jurisdiction to consider best interests of child under General Statutes § 46b-59 unless statutory requirements have been satisfied); *Castagno* v. *Wholean*, 239 Conn. 336, 339, 684 A.2d 1181 (1996) (same); see also *Kinney* v. *State*, 213 Conn. 54, 59, 566 A.2d 670 (1989); *Castro* v. *Viera*, supra, 435.

1

As with any issue of statutory interpretation, our initial guide is the language of the operative statutory provisions. *Federal Deposit Ins. Corp.* v. *Peabody, N.E., Inc.*, 239 Conn. 93, 102, 680 A.2d 1321 (1996); *Herbert S. Newman & Partners, P.C.* v. *CFC Construction Ltd.*

---

[21] General Statutes § 45a-706 provides: "The provisions of sections 17a-91, 17a-112, 17a-148, 45a-606, 45a-706 to 45a-709, inclusive, 45a-715 to 45a-718, inclusive, 45a-724 to 45a-734, inclusive, 45a-736, 45a-737 and 52-231a shall be liberally construed in the best interests of any child for whom a petition has been filed under said sections."

*Partnership*, 236 Conn. 750, 756, 674 A.2d 1313 (1996). Section 45a-724 (a) provides that "[t]he following persons may give a child in adoption: (1) A statutory parent . . . *may, by written agreement* . . . give in adoption to any adult person any minor child . . . . (2) . . . [A]ny parent of a minor child *may agree in writing* with his or her spouse that the spouse shall adopt . . . the child . . . . (3) . . . [T]he guardian or guardians of the person of any minor child who is free for adoption . . . *may agree in writing* . . . that [a] blood relative shall adopt the child. . . ." (Emphasis added.) Thus, the legislature has provided explicitly for only three types of adoption agreements under § 45a-724 (a). "Unless there is evidence to the contrary, statutory itemization indicates that the legislature intended the list to be exclusive." (Internal quotation marks omitted.) *State* v. *Breton*, 235 Conn. 206, 251, 663 A.2d 1026 (1995); *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 40, 664 A.2d 719 (1995); *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 101, 653 A.2d 782 (1995); *White Oak Corp.* v. *Dept. of Transportation*, 217 Conn. 281, 301, 585 A.2d 1199 (1991); see also *State* v. *Kish*, 186 Conn. 757, 766, 443 A.2d 1274 (1982) (statutory itemization indicates legislative intent to exclude unenumerated items). Consequently, the language of § 45a-724 (a) clearly indicates that the legislature intended that all adoption agreements conform to the statute's requirements.

Moreover, § 45a-727 (a) (1) provides that "[e]ach adoption matter shall be instituted by filing an application in a court of probate, *together with the written agreement of adoption* . . . ." (Emphasis added.) The requirement that an adoption application be accompanied by "the" written agreement of adoption, rather than by "a" written agreement of adoption, strongly

suggests that the legislature intended that adoption proceedings be instituted by filing, not only an adoption application, but also the written adoption agreement *mandated by § 45a-724 (a)*.

Furthermore, § 45a-727 (a) (3) provides that "[a]n *application* for the adoption of a minor child not related to the adopting parents shall not be accepted by the court of probate unless the child . . . has been placed . . . by the commissioner of children and families or a child-placing agency, *except as provided by section 45a-764*, and the placement . . . has been approved by the commissioner or a child-placing agency. . . ." (Emphasis added.) Thus, both § 45a-727 (a) (1) and (3) employ the term "application." "[T]he legislature is presumed to exercise its statutory authority . . . with the intention of creating one consistent body of law. . . . An identical term used in [statutory provisions] pertaining to the same subject matter should not be read to have differing meanings unless there is some indication from the legislature that it intended such a result." (Citations omitted; internal quotation marks omitted.) *Board of Public Utilities Commissioners* v. *Yankee Gas Services Co.*, 236 Conn. 287, 295, 672 A.2d 953 (1996). The language of §§ 45a-724 (a) and 45a-727 (a) (1) indicates that the term "application" in § 45a-727 (a) (1) was intended to refer to adoption applications that are accompanied by the adoption agreements required by § 45a-724 (a). That suggests, therefore, that the legislature intended that the placement requirement of § 45a-727 (a) (3) apply only to adoption "applications" that are supported by a written adoption agreement pursuant to § 45a-724 (a) that seeks to have a child adopted by a person or persons who are not related to the child.

Finally, § 45a-764 (a) provides that *"[n]otwithstanding the provisions of section 45a-727*, the Adoption Review Board may . . . waive the requirement that the

minor child be placed by the commissioner of children and families or a child-placing agency." (Emphasis added.) Also, § 45a-764 (f) specifically provides that if the placement requirement is waived, "there shall be included in the [Probate Court's] decree [granting the adoption] a finding that the placement requirements of *section 45a-727* have been waived by the Adoption Review Board." (Emphasis added.) The cross-references between §§ 45a-727 and 45a-764 and the explicit reference in § 45a-764 (f) to waiver of the placement requirements of § 45a-727 indicate that the legislature intended that § 45a-764 (a) give the board authority to waive only the *placement requirement* established in § 45a-727 (a) (3). Moreover, § 45a-764 (b) provides: "Any judge of probate who has had presented to him an application for adoption which may not proceed *because the child has not been so placed* may apply in writing to the Adoption Review Board for a *waiver of such requirement*"; (emphasis added); further suggesting that the legislature intended that the board's authority extend only to cases in which the Probate Court cannot grant the adoption application *because* the placement requirement of § 45a-727 (a) (3) has not been satisfied, and that the board's authority was not intended to extend to every case in which a child has been placed for adoption by someone other than the commissioner or a child-placing agency.

To summarize, we conclude that the language of the relevant adoption statutes clearly manifests the legislature's intention that: (1) an adoption application be supported by either a *statutory parent adoption agreement,* a stepparent adoption agreement or a blood relative adoption agreement pursuant to § 45a-724 (a); (2) adoption applications that are accompanied by an adoption agreement pursuant to § 45a-724 (a) seeking to have a child adopted by persons unrelated to the child not be accepted by the Probate Court unless the

placement requirement of § 45a-727 (a) (3) has been satisfied or waived; (3) § 45a-764 give the board authority to waive the placement requirement of § 45a-727 (a), but not the statutory parent requirement of § 45a-724 (a); and (4) the jurisdiction of the board to waive the placement requirement be limited to cases in which the *placement requirement is the reason* that the Probate Court cannot proceed with the adoption application.

2

We turn now to the next step in our analysis of the operative statutory provisions—specifically, the history of §§ 45a-727 (a) (1), 45a-724 (a) and 45a-727 (a) (3), the relevant adoption statutes that predate the establishment of the board in 1975. Connecticut's first adoption law was enacted in 1864.[22] From that time forward, the adoption statutes consistently have authorized certain written adoption agreements and consistently have provided for Probate Court approval of such written agreements.[23] We previously have concluded that the requirement that a written adoption agreement be submitted to a court of probate for approval limits the jurisdiction of the Probate Court to adoption applications that are supported by a statutorily authorized adoption agreement. *Killen* v. *Klebanoff*, supra, 140 Conn. 115–16 ("The fundamental basis of the [adoption] proceeding is the [written adoption] agreement. If the purported agreement is void, there is nothing which

[22] See Public Acts 1864, c. LXXXV, § 1, codified at General Statutes (1866 Rev.) tit. 13, c. IV, § 53.

[23] See General Statutes (1866 Rev.) tit. 13, c. IV, § 53; General Statutes (1888 Rev.) § 471; General Statutes (1902 Rev.) § 233; General Statutes (1918 Rev.) § 4878; General Statutes (1930 Rev.) § 4809; General Statutes (Cum. Sup. 1935) § 1580c; General Statutes (Sup. 1943) §§ 648g and 649g; General Statutes (Sup. 1947) § 1295i; General Statutes (1949 Rev.) §§ 6866 and 6867; General Statutes (Sup. 1953) § 2195c; General Statutes (Sup. 1955) § 2904d; General Statutes (1958 Rev.) §§ 45-61 and 45-63; General Statutes (Rev. to 1975) §§ 45-61i and 45-63 (in 1991, transferred in relevant part to §§ 45a-724 [a] and 45a-727 [a] [1], respectively).

the Probate Court can approve. . . . '[C]onsent lies at the foundation of statutes of adoption and when it *is required to be given and submitted the [Probate] Court cannot take jurisdiction of the subject matter without it.*' " [Emphasis added.]); see also *Johnson* v. *Terry*, 34 Conn. 259, 263 (1867) (adoption law "enables a parent under certain circumstances to [give a child in adoption], and impliedly restrains him under all others"). Thus, the requirement of § 45a-727 (a) (1) that "[e]ach adoption matter shall be instituted by filing an application in a court of probate, *together with the written agreement of adoption*"; (emphasis added); limits the subject matter jurisdiction of the Probate Court to adoption applications that are supported by a statutorily authorized adoption agreement.

The legislative history of § 45a-724 (a), which authorizes statutory parent, stepparent and blood relative adoption agreements, illuminates the legislature's intent regarding adoption agreements. In 1971, Governor Thomas Meskill appointed a task force to identify problems in Connecticut's adoption laws and to develop recommendations for solving those problems. 16 H.R. Proc., Pt. 7, 1973 Sess., p. 3544, remarks of Representative Ronald Bard. In its 1972 final report, the task force recommended that "three *separate* stages for an adoption proceeding" be created. (Emphasis added.) Report of the Governor's Task Force to Study the Adoption Laws, January, 1972, p. 1. Those stages were: (1) termination of parental rights; (2) appointment of a statutory parent; and (3) adoption. Id., pp. 1–3. The task force further recommended that a statutory parent "be the *only person* who can give [a] child in adoption (except in step parent adoptions)." (Emphasis added.) Id., p. 2.

The legislature responded to the task force's report by enacting Public Acts 1973, No. 73-156 (P.A. 73-156).[24]

---

[24] To the extent that a commission's recommendations serve as a basis for a subsequent statutory enactment, the commission's report is indicative

16 S. Proc., Pt. 3, 1973 Sess., p. 1433, remarks of Senator George Guidera; Conn. Joint Standing Committee Hearings, Judiciary, 1974 Sess., p. 194, remarks of Judge Glenn Knierim, Probate Court administrator for the state of Connecticut. Public Act 73-156, § 10, provides in relevant part: "The following persons may give a child in adoption: (a) A statutory parent[25] . . . may, *by written agreement,* subject to the approval of the court of probate . . . give in adoption to any adult person any minor child of whom he is the statutory parent . . . . (b) When one of the . . . parents of a minor child has died and the surviving parent has remarried . . . or when one . . . parent has been removed as guardian of the person of a minor child and the other . . . parent is the sole guardian of the person of the minor child and has married a person other than the parent who has been so removed, such . . . parent may *agree, in writing,* subject to the approval of the [P]robate [C]ourt . . . with the person with whom such remarriage or marriage is contracted that such person shall adopt or join in the adoption of [the minor] child . . . ." (Emphasis added.) During the discussion, on the floor of the House of Representatives, of Senate Bill No. 2287, which ultimately was enacted as P.A. 73-156, Representative James F. Bingham remarked: "The bill clarifies the jurisdiction of the [P]robate [C]ourt . . . [it] clearly defines those persons who may give the child in adoption . . . ." 16 H.R. Proc., supra, p. 3547. We conclude, therefore, that the legislature intended that the exception set forth in P.A. 73-156, § 10 (b), for stepparent adoption agreements be the *only* exception to the *jurisdictional* requirement under

of legislative intent. See *Ensign-Bickford Realty Corp.* v. *Zoning Commission,* 245 Conn. 257, 272, 715 A.2d 701 (1998); *West Hartford Interfaith Coalition, Inc.* v. *Town Council,* 228 Conn. 498, 510, 636 A.2d 1342 (1994).

[25] Public Act 73-156, § 9, defines "statutory parent" in relevant part as "the welfare commissioner or a child-placing agency licensed by said commissioner . . . ."

P.A. 73-156, § 10 (a), that a statutory parent, by written agreement, give a child in adoption.

Moreover, in keeping with the task force's recommendation that statutory parent adoption proceedings consist of three distinct stages; see Report of the Governor's Task Force to Study the Adoption Laws, January, 1972, p. 1; during that same discussion, Bard remarked that "the [bill] provides three *separate* stages for adoption proceedings, stage 1 . . . parental rights [would be] terminated. . . . The next stage would be the employment of a statutory parent . . . . The third stage would be the adoption." (Emphasis added.) 16 H.R. Proc., supra, pp. 3545–46. We further conclude, therefore, that the legislature intended that appointment of a statutory parent take place prior to the institution of an adoption proceeding and not as part of the actual adoption proceeding itself.

"As with all new legislation . . . especially legislation as [far] reaching as P.A. 73-156 there developed many technical difficulties and oversights." Conn. Joint Standing Committee Hearings, Judiciary, 1974 Sess., p. 194, remarks of Judge Knierim. Consequently, in the following year, by enacting Public Acts 1974, No. 74-164 (P.A. 74-164), § 9, the legislature amended the jurisdictional requirement that an adoption proceeding be instituted by an application supported by a statutory parent or stepparent adoption agreement. Section 9 of the 1974 Public Act provided in relevant part: "The following persons may give a child in adoption: (a) A statutory parent . . . may, by written agreement, subject to the approval of the court of probate . . . give in adoption to any adult person any minor child of whom he is the statutory parent . . . . (b) Subject to the approval of the court of probate . . . any parent of a minor child who is (1) the surviving parent when the other parent has died . . . or, (4) the sole guardian of the person of said child, the other parent's parental

rights having been terminated . . . may agree in writing, with the person to whom they are married that such person shall adopt or join in the adoption of such child. *(c) Subject to the approval of the court of probate . . . the guardian . . . of the person of any minor child who is free for adoption . . . may agree in writing with a blood relative . . . that such blood relative shall adopt such child. . . ."*[26] (Emphasis added.) During the committee hearing on House Bill No. 5735, which ultimately was enacted as P.A. 74-164, Judge Knierim remarked that the bill "retains the three major steps in the adoption process . . . (1) termination of parental rights; (2) appointment of statutory parent; and (3) the adoption proceeding. . . . As did P.A. 73-156 *[the bill] carefully limits those persons who may apply for adoption. A statutory parent . . . may apply. In addition, the stepparent may apply in carefully defined situations. A significant change, however, is the proposal that we allow a blood relative to apply for adoption without using a statutory parent."* (Emphasis added.) Conn. Joint Standing Committee Hearings, Judiciary, 1974 Sess., pp. 194–95. We conclude, therefore, that the legislative history of P.A. 74-164 manifests the legislature's intention that the exceptions for stepparent adoption agreements and blood relative adoption agreements be the *only two exceptions to the requirement that a statutory parent, by written agreement, give a child in adoption.* We also conclude that the legislative history of P.A. 74-164 manifests the legislature's intention that appointment of a statutory parent be a *condition precedent* to Probate Court jurisdiction over a statutory parent adoption application.

The legislative history of the placement requirement of § 45a-727 (a) (3) provides further evidence of the

---

[26] See General Statutes (Rev. to 1975) § 45-61i, transferred in 1991 to § 45a-724.

legislature's intent regarding the jurisdiction of the Probate Court. The requirement that a child be placed for adoption by the commissioner or a child-placing agency first was enacted in 1957. Public Acts 1957, No. 203 (P.A. 203), § 1, provides in relevant part: "Except in the case of (1) a child sought to be adopted by a stepparent, sister, brother, aunt, uncle or grandparent or (2) a child received by the proposed adopting parent from an agency outside this state with the written consent of the welfare commissioner, *no application shall be accepted by the [P]robate [C]ourt unless the child sought to be adopted has been placed for adoption by said commissioner after being committed to him or by an agency licensed by said commissioner . . . .*" (Emphasis added.) During the discussion on the Senate floor of House Bill No. 383, which ultimately was enacted as P.A. 203, Senator Florence D. Finney explained the need for the placement requirement: "[V]ery often the [P]robate [C]ourt does not enter the picture until after the child has become a part of the family. In [those] circumstances, *it is very difficult for a probate judge to deny the adoption* even though there might be doubts as to its being in the best interests of the child . . . ." (Emphasis added.) 7 S. Proc., Pt. 3, 1957 Sess., p. 1641. In the committee hearing on House Bill No. 383, attorney Joseph Cooney similarly remarked: "The probate judges will tell you that *they are practically forced to approve adoptions because of the situation that has intervened since the [unauthorized] placement* in cases where they would not originally have approved the placement." (Emphasis added.) Conn. Joint Standing Committee Hearings, Public Welfare and Humane Institutions, 1957 Sess., p. 198. "[I]t is now well settled that testimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation. . . . This is because legislation is a purposive act . . . and, therefore, identifying

the particular problem that the legislature sought to resolve helps to identify the purpose or purposes for which the legislature used the language in question." (Internal quotation marks omitted.) *Ferrigno* v. *Cromwell Development Associates*, 244 Conn. 189, 197, 708 A.2d 1371 (1998); *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 450, 692 A.2d 742 (1997). Both Cooney's remarks and those of Senator Finney indicate that the placement requirement was intended to prevent situations in which the Probate Court judge felt compelled, despite some reservations, to approve an adoption because the child already had been assimilated into the proposed adoptive home. Those remarks, therefore, clearly indicate that the placement requirement was intended to apply in cases in which the Probate Court *already had authority to approve the adoption* and that it was not intended to serve as an alternate basis for Probate Court jurisdiction over an adoption application.

Public Act 73-156, § 12, subsequently amended the placement requirement to provide: "Except in the case of (1) a child sought to be adopted by a *stepparent or blood relative* . . . or (2) a child received by the proposed adopting parent from an agency outside this state with the written consent of the welfare commissioner, no application shall be accepted by the [P]robate [C]ourt unless the child sought to be adopted has been placed for adoption by said commissioner *after being committed to [the commissioner] or after [the commissioner] has been made statutory parent of such child* or by an agency licensed by said commissioner . . . ." (Emphasis added.) Thus, P.A. 73-156, § 12, referred to the appointment of a statutory parent as a predicate to placement for adoption by the commissioner, clearly indicating that the legislature did not intend the phrase "placed for adoption" to mean "given in adoption by a statutory parent" and that, therefore, the requirement that a child be placed for adoption by

the commissioner or a child-placing agency is distinct from the requirement that a statutory parent, i.e., the commissioner or a child-placing agency, give the child in adoption by written agreement.

The legislative history of P.A. 74-164 is further instructive of the legislature's intent regarding the placement requirement. Section 10 of P.A. 74-164 amended the requirement to provide: "No application for the adoption of a minor *child not related to the adopting parents* shall be accepted by the court of probate unless the child sought to be adopted has been placed for adoption by the welfare commissioner or a child-placing agency, and such placement for adoption has been approved by the welfare commissioner or a child-placing agency. . . ."[27] During the judiciary committee hearing on House Bill No. 5735, which ultimately was enacted as P.A. 74-164, Judge Knierim stated: "As far as stepparent adoptions are concerned, this proposal makes them very simple, no outside agency will be involved"; Conn. Joint Standing Committee Hearings, Judiciary, 1974 Sess., p. 198; indicating that the exception to the placement requirement for "application[s] for the adoption of a *minor child [related] to the adoptive parents*"; (emphasis added); was intended to apply not only to blood relative adoptions but also to stepparent adoptions.[28]

---

[27] See General Statutes (Rev. to 1975) § 45-63, transferred in relevant part to § 45a-727 (a) (3) in 1991.

[28] Moreover, Public Acts 1996, No. 96-130, which was entitled "An Act Concerning a *Technical* Revision of the Adoption Statutes"; (emphasis added); subsequently amended the language of the placement requirement specifically to provide that the placement requirement does not apply to either stepparent or blood relative adoptions. See General Statutes (Rev. to 1997) § 45a-727 (a) (3); see also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 1996 Sess., p. 2338, testimony of Judge F. Paul Kurmay, Probate Court administrator ("[t]hese revisions are technical in nature and are meant to clarify and simplify the current language"); id., p. 2339, testimony of David L. Hemond, chief attorney, Connecticut law revision commission ("[t]he proposed revisions are clarifying, stylistic, and organizational but do not change underlying substantive rights of the parties").

During that same hearing Judge Knierim further remarked that the placement requirement was needed because "we found out that . . . people were bringing children into Connecticut and then pressuring agencies to agree *to become statutory parents* even though the agency had not placed the child or studied the home." (Emphasis added.) Id., p. 201. Thus, the legislative history of P.A. 74-164 also indicates that the placement requirement was intended to apply *only to statutory parent adoptions and not to stepparent or blood relative adoptions*, and that the placement requirement was intended to serve as an addition to the existing limitation of Probate Court jurisdiction to adoption applications supported by an authorized written agreement of adoption, i.e., a statutory parent, stepparent or blood relative adoption agreement, rather than as an alternate basis for Probate Court jurisdiction over an adoption application.

Taking into consideration the language, genealogy and legislative history of the relevant adoption statutes, and our prior interpretations of those statutes, we conclude, therefore, that prior to the establishment of the board in 1975, the adoption statutes gave the Probate Court jurisdiction over only three categories of adoption agreements: statutory parent adoption agreements; stepparent adoption agreements; and blood relative adoption agreements. See General Statutes (Rev. to 1975) § 45-61i.[29] Moreover, the adoption statutes required that, except in cases of adoptions supported by a stepparent or blood relative adoption agreement, appointment of a statutory parent take place prior to the institution of the actual adoption proceeding. See General Statutes (Rev. to 1975) § 45-63.[30] Finally, adoption applications supported by a statutory parent agreement, but not adoption applications supported by

---

[29] In 1991, § 45-61i was transferred to § 45a-724 (a).

[30] In 1991, § 45-63 was transferred in relevant part to § 45a-727 (a) (1).

a stepparent or blood relative agreement, were subject
to an additional jurisdictional requirement that the child
have been placed in the proposed adoptive home by
the commissioner or by a child-placing agency. General
Statutes (Rev. to 1975) § 45-63.[31]

3

We next consider the legislative history of § 45a-764,
the statutory provision that addresses the relevant pow-
ers and responsibilities of the board. Public Acts 1975,
No. 75-163 (P.A. 75-163), §§ 1 and 2, provides in relevant
part: "Section 1. (NEW) There is established an adop-
tion review board which shall consist of the commis-
sioner of the department of children and youth
services[32] or his designee and the [P]robate [C]ourt
administrator or his designee and an officer of a child
placing agency . . . . Sec. 2. (NEW) *Notwithstanding
the provisions of section 45-63 of the general statutes*,
the adoption review board may, upon application,
notice and hearing as hereinafter provided, for cause
shown that it is in the best interest of the minor child,
waive the requirement that such minor child *be placed*
by the commissioner of the department of children and
youth services or a child placing agency. Any judge of
probate who has had presented to him an application
for adoption which may not proceed because the child
has not been so placed may apply in writing to the
adoption review board for a waiver of such requirement.
. . . [T]he board may deny the application or approve
the application in which case the chairman shall notify
the court of probate that the adoption may proceed and
that the requirement of placement by the commissioner
of the department of children and youth services or a
child placing agency is waived. . . . No such waiver

[31] In 1991, § 45-63 was transferred in relevant part to § 45a-727 (a) (3).
[32] Public Acts 1993, No. 93-91, amended the adoption statutes to substitute
"commissioner of children and families" for "commissioner of children and
youth services."

shall be granted if it is determined by the board that the adoption proceeding would violate the public policy of the state against the obtaining of children by illegal means for adoption purposes. . . ." (Emphasis added.) See General Statutes (Rev. to 1977) §§ 45-69c and 45-69d.[33]

Public Act 75-163, § 4, provides in relevant part: "Section 45-63 of the general statutes is repealed and the following is substituted in lieu thereof: Each adoption matter shall be instituted by filing an application in a court of probate, *together with the written agreement of adoption* . . . . No application for the adoption of a minor child not related to the adopting parents shall be accepted by the court of probate unless the child sought to be adopted has been placed for adoption by the commissioner of the department of children and youth services or a child-placing agency *except as provided by section 2 of this act*, and such placement for adoption has been approved by said commissioner or a child-placing agency. . . ."[34] (Emphasis added.) See General Statutes (Rev. to 1977) § 45-63. As shown by the cross-reference from § 4 to § 2 of P.A. 75-163, the fact that the legislature amended § 45-63 to include a reference to waiver, pursuant to § 2, of the *placement* requirement but not to include a reference to a waiver of the jurisdictional requirement that an adoption application be supported by an authorized written agreement of adoption, strongly suggests that the legislature intended that P.A. 75-163 provide the board authority to waive only the requirement that the child be placed for adoption by the commissioner or by a child-placing agency, and not to waive the jurisdictional requirement that an adoption application be supported by a statutory

---

[33] In 1991, §§ 45-69c and 45-69d were transferred to §§ 45a-763 and 45a-764, respectively.

[34] In 1991, § 45-63 was transferred in relevant part to § 45a-727 (a) (1) and (3).

parent, stepparent or blood relative adoption agreement.

The legislative history of P.A. 75-163 also indicates that the legislature intended that the authority of the board be limited to waiver of the placement requirement. During the committee hearing on Senate Bill No. 1071, which ultimately was enacted as P.A. 75-163, Judge Knierim explained: "Our new Adoption Law has worked remarkably well . . . it's been in operation since May 10 of [1974] and really there are no major problems except the one that this bill deals with. The law requires, as I said before, that a child, *other than in a [stepparent] or in a relative adoption* . . . must have been placed by an agency or by the Welfare Commissioner." (Emphasis added.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1975 Sess., p. 426. "As a result of the new adoption law, there are children living in homes where it is technically impossible to proceed with an adoption. Unless the child was actually *placed in that home* by either the Welfare Commissioner or a licensed agency or an approved agency, an adoption may not proceed under the new adoption law." (Emphasis added.) Id., p. 20; see also 18 H.R. Proc., Pt. 5, 1975 Sess., p. 2385, remarks of Representative James T. Healey ("[T]here are a small number of meritorious cases where the child, *in fact, was not placed either by the Commissioner or by a child-[placing] agency.* And up until now we have had no way whatsoever of dealing with that particular situation." [Emphasis added.]).

We conclude, therefore, that the legislature intended that the board have authority to waive the requirement that a statutory parent adoption application not be accepted by the Probate Court unless the child has been placed in the proposed adoptive home by the commissioner or a child-placing agency, and that the legislature did not intend that the board have authority

to waive the requirement that an adoption application be accompanied by a statutory parent, stepparent or blood relative adoption agreement.[35]

To summarize, we conclude that: (1) § 45a-727 (a) (1) limits the jurisdiction of the Probate Court to adoption applications that are accompanied by a written adoption agreement authorized by § 45a-724 (a); (2) the *only* adoption agreements authorized by § 45a-724 (a) are statutory parent agreements, stepparent agreements and blood relative agreements; (3) under § 45a-727 (a) (1), appointment of a statutory parent is a condition precedent to the initiation of a statutory parent adoption proceeding; (4) § 45a-727 (a) (3) limits the jurisdiction of the Probate Court by prohibiting it from accepting statutory parent adoption applications unless the child has been "placed for adoption" by the commissioner or a placement agency; (5) § 45a-764 provides the board authority to waive the placement requirement of § 45a-727 (a) (3) but not the requirement of § 45a-724 (a) that, except in stepparent and blood relative adoptions, an adoption application must be accompanied by a statutory parent adoption agreement.

4

Despite our determination that the placement requirement applies only to statutory parent adoption agreements and that the board has jurisdiction to waive only this placement requirement, the plaintiffs nevertheless claim that § 45a-764 provides the board authority to waive the placement requirement of § 45a-727 (a) (3) even when, at the time the waiver application is submitted to the board, there is no underlying statutory parent adoption agreement pursuant to § 45a-724 (a) (1).

---

[35] There have been no further relevant changes to the adoption statutes. See General Statutes § 45a-724 (a), formerly § 45-61i, § 45a-727 (a) (1) and (3), formerly § 45-63, and § 45a-764, formerly, § 45-69d.

We have concluded that the placement requirement was intended to apply to statutory parent adoption agreements pursuant to § 45a-724 (a) (1), but not to stepparent and blood relative adoption agreements pursuant to § 45a-724 (a) (2) and (3). Thus, a waiver of the placement requirement is required for statutory parent adoptions in which the child was not placed in the proposed adoptive home by the commissioner or a child-placing agency, but a waiver is not required in stepparent or blood relative adoptions in which the child has not been so placed. We must determine, therefore, whether the plaintiffs' adoption agreement constitutes either a statutory parent, a stepparent or a blood relative adoption agreement within the meaning of § 45a-724 (a).

Section 45a-724 (a) (1) provides that, subject to the approval of the Probate Court, a statutory parent appointed under the provisions of § 17a-112, § 45a-717 or § 45a-718 may give a child in adoption to any adult person. "Statutory parent" is defined as "the commissioner of children and families or the child-placing agency appointed by the court for the purpose of giving a minor child or minor children in adoption . . . ." General Statutes § 45a-707 (f). It is undisputed that neither Anne nor Malinda is Baby Z.'s statutory parent. Consequently, the plaintiffs' adoption agreement does not constitute a statutory parent agreement within the meaning of § 45a-724 (a) (1).[36]

---

[36] General Statutes §§ 17a-112 and 45a-717 authorize the appointment of a statutory parent pursuant to a formal petition for termination of existing parental rights. Because the plaintiffs seek to preserve rather than terminate Anne's parental rights, General Statutes § 45a-718 consequently provides the only possible basis for the appointment of a statutory parent for Baby Z.

General Statutes § 45a-718 (a), however, provides in relevant part: "*If a child is free for adoption* as provided in section 45a-725, and no appointment of a statutory parent has been made under section 17a-112 or section 45a-717, the court of probate shall appoint a statutory parent for the child upon petition for appointment of a statutory parent . . . ." (Emphasis added.) Section 45a-725 in turn provides in relevant part that a child is free for

Section 45a-724 (a) (2) provides in relevant part that subject to Probate Court approval, the sole legal parent of a minor child "may agree in writing with his or her *spouse* that the spouse shall adopt or join in the adoption of the child . . . ." (Emphasis added.) Although it is undisputed that Anne is Baby Z.'s sole legal parent, there is no claim that Malinda is Anne's legal spouse. Moreover, we see nothing in the language or legislative history of § 45a-724 (a) (2) to suggest that the legislature intended that the term "spouse" in § 45a-724 (a) (2) apply to persons who are not legally married to the child's sole legal parent. Prior to 1980, the stepparent provision of the adoption statutes was specifically limited to adoption agreements between the child's sole legal parent and "the person with whom *re-marriage shall be solemnized*"; General Statutes (1888 Rev.) § 473; General Statutes (1902 Rev.) § 235; see General Statutes (1918 Rev.) § 4880; General Statutes (1930 Rev.) § 4812; General Statutes (Cum. Sup. 1935) § 1581c; "the person with whom *such marriage or remarriage is contracted*"; General Statutes (Sup. 1943) § 651g; General Statutes (1949 Rev.) § 6868; or "the person to whom *they are married.*" (Emphasis added.) General Statutes (Rev. to 1975) § 45-61i; General Statutes (Rev. to 1979) § 45-61i.

Public Acts 1980, No. 80-476 (P.A. 80-476), which was entitled "An Act Implementing the Law Revision Commission's *Technical* Revision of the Probate Laws"; (emphasis added); amended General Statutes (Rev. to 1979) § 45-61i to remove the term "person to whom *they are married*" and to provide instead that a child's

adoption when: (1) the child has no living parents; (2) the parents were removed as guardians of the person before October 1, 1973; or (3) all parental rights have been terminated under Connecticut law. It is undisputed that neither of the first two conditions set forth in § 45a-725 has been satisfied in the present case. Baby Z., therefore, cannot be "free[d] for adoption" as required for the appointment of a statutory parent pursuant to § 45a-718 without terminating Anne's parental rights.

sole legal parent "may agree in writing with his or her *spouse* that the spouse shall adopt or join in the adoption of the child . . . ." (Emphasis added.) See General Statutes (Rev. to 1981) § 45-61i (a) (2). The raised committee version of Senate Bill No. 664, the bill ultimately enacted as P.A. 80-476, provides: "STATEMENT OF PURPOSE: To *technically revise* Title 45 of the [G]eneral [S]tatutes by simplifying and clarifying statutory language, improving statute readability, removing redundant and obsolete language, and ensuring that internal references are current and correct." (Emphasis added.) Thus, taken together with the legislative history of P.A. 80-476, the language of § 45a-724 (a) (2) clearly indicates that the legislature intended that the word "spouse" in § 45a-724 (a) (2) mean "person to whom they are married" and that the legislature intended that the stepparent exception permit a child's sole legal parent to give the child in adoption only to a person who is that parent's *legal spouse.*

We recognize that § 45a-706, which was enacted as part of P.A. 73-156, provides that § 45a-724 "shall be liberally construed in the best interests of any child for whom a petition has been filed under said sections." Nevertheless, we are not persuaded that the legislative mandate that § 45a-724 be "liberally construed in the best interests of any child" was intended to permit the stepparent exception of § 45a-724 (a) (2) to authorize a parent to give a child in adoption to a person who is not the parent's legal spouse. Although P.A. 73-156, § 3, excepted blood relative adoptions from the placement requirement, as we have stated earlier, the act did not except such adoptions from the requirement that the child be given in adoption by a statutory parent. Consequently, in 1974, the legislature felt it necessary to amend the adoption statutes to include an additional specific exception to the statutory parent requirement for blood relative adoptions. See P.A. 74-164, § 9; Conn.

Joint Standing Committee Hearings, Judiciary, 1974 Sess., pp. 194–95, remarks of Judge Knierim. Thus, the legislative history of § 45a-724 (a) indicates that the mandate of § 45a-706 that § 45a-724 be liberally construed was not intended to broaden the stepparent exception of § 45a-724 (a) (2) to include an otherwise unauthorized adoption agreement. We therefore conclude that the plaintiffs' adoption agreement does not constitute a stepparent adoption agreement within the meaning of § 45a-724 (a) (2).

Finally, § 45a-724 (a) (3) provides that subject to Probate Court approval, a guardian of the person of a minor may give a child in adoption to "a blood relative descended from a common ancestor not more than three generations removed from the child . . . ." Although it is undisputed that Anne is the sole guardian of the person of Baby Z., there is no claim that Malinda is a blood relative of Baby Z. We conclude, therefore, that the plaintiffs' adoption agreement also does not meet the requirements of § 45a-724 (a) (3).

The plaintiffs, moreover, do not contend that their adoption application is a statutory parent adoption application. Instead, they maintain that § 45a-764 provides the board jurisdiction to consider not only waiver applications that are supported by an underlying statutory parent adoption agreement pursuant to § 45a-724 (a) (1), but also waiver applications that are supported by adoption agreements that are *not* authorized by § 45a-724 (a). The plaintiffs further maintain that upon the board's granting a waiver of the placement requirement, the Probate Court will have the authority to transform their unauthorized adoption agreement into a statutory parent agreement. The board, however, maintains that § 45a-764 provides the board with authority to consider only waiver applications that are submitted to the board in connection with a statutory parent adoption agreement pursuant to § 45a-724 (a) (1) and to

consider those applications with a view toward waiving only the placement requirement and not the statutory parent requirement. We agree with the board.

We preface our analysis of this question by again noting that "[a]dministrative agencies [such as the board] are tribunals of limited jurisdiction and their jurisdiction is dependent entirely upon the validity of the statutes vesting them with power and they cannot confer jurisdiction upon themselves." (Internal quotation marks omitted.) *Hunnihan* v. *Mattatuck Mfg. Co.*, supra, 243 Conn. 443–44; *Castro* v. *Viera*, supra, 207 Conn. 428. Section 45a-764 provides in relevant part: "(a) [T]he Adoption Review Board may, *upon application . . . as hereinafter provided . . .* waive the requirement that the minor child *be placed* by the commissioner of children and families or a child-placing agency. (b) Any judge of probate who has had presented to him an application for adoption *which may not proceed because the child has not been so placed may apply in writing to the Adoption Review Board* for a waiver of such requirement. . . ." (Emphasis added.) Thus, § 45a-764 authorizes the board to consider only waiver applications that cannot proceed *because* the *placement requirement of § 45a-727 (a) (3) has not been satisfied.* In cases in which the Probate Court lacks jurisdiction over an adoption application because the application is not supported by a written adoption agreement pursuant to § 45a-724 (a), however, the adoption cannot proceed regardless of whether the child was placed in the proposed adoptive home by the commissioner or by a child-placing agency. Consequently, in cases such as this, it cannot be argued plausibly that the adoption may not proceed only *because* the placement requirement of § 45a-727 (a) (3) has not been satisfied. That is because, even if the placement requirement were waived, there would be no statutory parent

adoption agreement, and the board cannot waive that requirement.

Moreover, we reiterate that, like administrative agencies such as the board, "[o]ur courts of probate have a limited jurisdiction and can exercise only such powers as are conferred on them by statute. . . . They have jurisdiction only when the facts exist on which the legislature has conditioned the exercise of their power." (Internal quotation marks omitted.) *Castro* v. *Viera*, supra, 207 Conn. 428; *Killen* v. *Klebanoff*, supra, 140 Conn. 115; *Palmer* v. *Reeves*, supra, 120 Conn. 408–409. " '[A] court which exercises a limited and statutory jurisdiction is without jurisdiction to act unless it does so under the precise circumstances and in the manner particularly prescribed by the enabling legislation.' " *Marcus' Appeal from Probate*, supra, 199 Conn. 528–29; *Heiser* v. *Morgan Guaranty Trust Co.*, supra, 150 Conn. 565.

We have concluded that § 45a-727 (a) (1) limits the jurisdiction of the Probate Court to adoption proceedings that are instituted by the filing of an adoption application that is accompanied by a written adoption agreement authorized by § 45a-724 (a), and that § 45a-727 (a) (3) further limits the Probate Court's jurisdiction by prohibiting the court from accepting statutory parent adoption applications unless the child has been "placed for adoption" by the commissioner or a child-placing agency. We have also concluded that pursuant to § 45a-724 (a), appointment of a statutory parent is a *condition precedent* to the institution of a statutory parent adoption proceeding. Moreover, although § 45a-724 (b) specifically authorizes the Probate Court, under certain circumstances, to terminate parental rights as part of a stepparent and blood relative adoption proceeding,[37]

---

[37] General Statutes § 45a-724 (b) provides: "If all parties consent to the adoption under subdivisions (2) and (3) of subsection (a) of this section, then the application to be filed under section 45a-727 shall be combined

we see nothing in the language or legislative history of any of the other adoption statutes to indicate that the legislature intended those statutes to give the Probate Court the authority to terminate parental rights and appoint a statutory parent for a child *as part of a statutory parent adoption proceeding.* We further conclude, therefore, that the Probate Court lacks jurisdiction to terminate parental rights and appoint a statutory parent as part of a statutory parent adoption proceeding. Consequently, the Probate Court does not have authority to transform an unauthorized adoption application into a statutory parent adoption application after the adoption proceeding has been instituted.

Thus, even if, despite the language and legislative history of the relevant adoption statutes, the placement requirement somehow were applicable to adoption applications that are not supported by a statutory parent adoption agreement and § 45a-764 somehow were to afford the board authority to waive the placement requirement in such cases, the Probate Court, upon the receipt of such waiver, would nonetheless lack jurisdiction over the adoption application because of the absence of a supporting statutory parent, stepparent or blood relative adoption agreement pursuant to § 45a-724 (a). Consequently, in effect, the plaintiffs urge us to construe the adoption statutes to provide the board authority to grant, *after providing notice and a hearing,* a meaningless waiver of the placement requirement of § 45a-727 (a) (3). "If there are two possible interpretations of a statute, [however] we will adopt the more reasonable construction over one that is unreasonable. *State* v. *Uretek, Inc.,* 207 Conn. 706, 719, 543 A.2d 709 (1988); *State* v. *Parmalee,* 197 Conn. 158, 165, 496 A.2d

with the consent termination of parental rights to be filed under section 45a-717. An application made under subdivisions (2) and (3) of subsection (a) of this section shall not be granted in the case of any child who has attained the age of twelve without the child's consent."

186 (1985). We presume that the legislature had a purpose for each sentence, clause or phrase in a legislative enactment, and that it did not intend to enact meaningless provisions. *Zichichi* v. *Middlesex Memorial Hospital,* 204 Conn. 399, 407, 528 A.2d 805 (1987)." (Internal quotation marks omitted.) *Hall* v. *Gilbert & Bennett Mfg. Co.,* 241 Conn. 282, 303, 695 A.2d 1051 (1997); *Turner* v. *Turner,* 219 Conn. 703, 713, 595 A.2d 297 (1991). We conclude, therefore, that the placement requirement of § 45a-727 (a) (3) does not apply to adoption applications that are not supported by a statutory parent adoption agreement pursuant to § 45a-724 (a) (1), and that § 45a-764 does not give the board authority to consider an application for a waiver of the placement requirement if the underlying adoption application is not supported by a statutory parent adoption agreement. Because the plaintiffs' adoption application was not accompanied by such an agreement, we further conclude that the board lacked jurisdiction to consider the waiver application submitted to the board by the Probate Court in connection with the plaintiffs' adoption application.

C

The plaintiffs have attempted to raise various constitutional arguments as alternate grounds for affirmance of the judgment of the Superior Court, *Handy, J.,* sustaining their administrative appeal from the board's denial of their waiver application. In effect, however, the plaintiffs are not challenging the constitutionality of § 45a-764, the statutory provision at issue in this appeal. Instead, they are contending that denial of their adoption application constitutes a deprivation of their constitutional rights, and Baby Z.'s constitutional rights, to due process and equal protection. In the plaintiffs' appeal to the Superior Court from the judgment of the Probate Court denying their adoption application, the Superior Court, *Austin, J.,* however, neither granted

nor denied the plaintiffs' adoption application. *In re Baby Z.*, supra, 45 Conn. Sup. 53. Instead, the Superior Court remanded the case to the Probate Court with direction to submit a waiver application to the board. Id. The court specifically determined that it was not necessary to consider the plaintiffs' constitutional claims regarding denial of their adoption application because the court was not denying that application. "It is axiomatic that, except insofar as the constitution bestows upon this court jurisdiction to hear certain cases . . . the subject matter jurisdiction of the Appellate Court and of this court is governed by statute." (Citation omitted; internal quotation marks omitted.) *Ruggiero* v. *Fuessenich*, 237 Conn. 339, 344, 676 A.2d 1367 (1996); see *Grieco* v. *Zoning Commission*, 226 Conn. 230, 231–32, 627 A.2d 432 (1993). "It is equally axiomatic that, except insofar as the legislature has specifically provided for an interlocutory appeal or other form of interlocutory appellate review . . . [our] appellate jurisdiction is limited to final judgments of the trial court. General Statutes § 52-263 . . . ." (Citation omitted; internal quotation marks omitted.) *Ruggiero* v. *Fuessenich*, supra, 344–35; *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, 230 Conn. 441, 447, 645 A.2d 978 (1994). General Statutes § 52-263 provides in relevant part: "Upon the trial of all matters of fact in any cause or action in the Superior Court, whether to the court or jury, or before any judge thereof when the jurisdiction of any action or proceeding is vested in him, if either party is aggrieved by the decision of the court or judge *upon any question or questions of law arising in the trial* . . . he may appeal to the court having jurisdiction from the *final judgment* of the court or of such judge . . . ." (Emphasis added.) Because the plaintiffs' constitutional claims do not challenge the constitutionality of § 45a-764, the statute at issue in this appeal, but instead challenge the

constitutionality of a *future* order, rather than a final judgment, of the Superior Court, we conclude that those claims cannot be raised in this appeal. Instead, such claims must be raised in further proceedings before the Superior Court pursuant to their original probate appeal or in any subsequent appeal taken from a final judgment of that court denying their adoption application.

We recognize that all of the child care experts involved in this case have concluded that the proposed adoption would be in Baby Z.'s best interest. Because of the statutory nature of our adoption system, however, policy determinations as to what jurisdictional limitations apply are for *the legislature, not the judiciary,* to make. *Doe* v. *Doe,* supra, 244 Conn. 443–44; *Remkiewicz* v. *Remkiewicz,* 180 Conn. 114, 120, 429 A.2d 833 (1980); see also *Dowling* v. *Slotnik,* 244 Conn. 781, 811, 712 A.2d 396 (1998); *Discuillo* v. *Stone & Webster,* 242 Conn. 570, 577, 698 A.2d 873 (1997). Thus, even though the plaintiffs have presented a factual record that may warrant sympathetic consideration of their adoption application, their petition cannot transcend the jurisdictional limits of the adoption statutes. See *Discuillo* v. *Stone & Webster,* supra, 577; *Kinney* v. *State,* supra, 213 Conn. 58. The members of our legislature, as elected representatives of the people, have the power and responsibility to establish the requirements for adoption in this state. The courts simply cannot play that role. See *In the Interest of Angel Lace M.,* 184 Wis. 2d 492, 517–18, 516 N.W.2d 678 (1994).

D

In conclusion, we note that, rhetoric aside, the dissent's arguments do not hold water. First, § 45a-764 does not provide that the board "may . . . for cause shown that it is in the best interests of the minor child, waive" any and all requirements set forth in the adoption statutes as the dissent impliedly asserts. Rather,

§ 45a-764 provides only that the board may "waive the requirement that the minor child be *placed* by the commissioner . . . or a child-placing agency. . . ." (Emphasis added.) Because the phrase "requirement that the minor child be *placed* by the commissioner . . . or a child-placing agency" circumscribes and defines the board's jurisdiction, our construction of that phrase cannot ignore the clearly stated legislative intent. Placement by the commissioner or a child-placing agency, therefore, is all that the board is authorized to waive.

Second, the dissent argues in part II of its opinion that the cases cited as support for our conclusion that the best interests of the child may not transcend the jurisdictional limitations of the statute, *a proposition to which the dissent claims to subscribe*, are inapposite. Perhaps because § 45a-764 is not included in the legislative mandate that certain adoption statutes be liberally construed in the best interests of the child; see General Statutes § 45a-706; the dissent maintains that a liberal construction of § 45a-764 is in order because § 45a-764 is a remedial statute. It is immaterial, however, whether a liberal construction is mandated by statute or by the judicial rule that remedial statutes, such as those at issue in the cited workers' compensation cases, are subject to liberal construction. In either situation, the statute at issue is construed liberally *in order to effectuate the intent of the legislature.* Thus, regardless of whether the mandate that an adoption statute be construed liberally is found explicitly in a statutory provision or is inferred from the statute's remedial purpose, our liberal construction of the statutory terms *may not contravene the expressed intent of the legislature.*

Third, the mere fact that it is possible to construct a convoluted argument to justify an inference that the word "given" can be substituted for the word "placed" in § 45a-764 (a) does not provide a legitimate basis for

this court to construe the word "placed" in § 45a-764 as being interchangeable with the word "given." Even when liberally construing a statute, we cannot properly stretch the statutory language to encompass a meaning that outstrips the expressed intent of the legislature. The legislative history of the adoption statutes is replete with compelling evidence that § 45a-764 was intended to permit waiver of only the placement requirement of § 45a-727 (a) and not to serve as a vehicle for waiver of the requirement under § 45a-724 (a) that a statutory parent institute the legal process by which a child is given in adoption. Consequently, there is no principled basis for construing the phrase "the requirement that the minor child be placed by the commissioner . . . or a child-placing agency" in § 45a-764 (a) to meet the requirement in § 45a-724 (a) that the child be given in adoption by the commissioner or a child-placing agency that has been appointed by the court to represent the child. Moreover, the plaintiffs themselves in their brief have acknowledged the distinction between a child being " 'placed' in the potential adoptive home" and the child being "given" in adoption by a statutory parent pursuant to § 45a-724 (a).

Fourth, we unequivocally reject the dissent's argument that the statutory language plainly indicates that § 45a-764 (a) provides the board with authority to waive not only the requirement under § 45a-727 (a) that the child be placed in the prospective adoptive home by the commissioner or a child-placing agency but also the requirement under § 45a-724 (a) that the child be given in adoption by a statutory parent. To the contrary, the plain language of § 45a-764 (f) directs that upon a granting of a waiver by the board, the Probate Court shall include in the adoption decree a finding that the placement requirement of § 45a-727 has been waived— clearly indicating that the legislature intended that the board's waiver authority be limited to the placement

requirement of § 45a-727. Moreover, the dissent is patently incorrect in its assumption that the composition of the board set forth in General Statutes § 45a-763 (a) indicates that "no additional quantum of protection" could result from adherence to the requirement that a child be given in adoption by a statutory parent. Pursuant to § 45a-727 (b), the statutory parent is required to perform an investigation and report to the Probate Court such facts as may be relevant to the court's determination regarding whether the proposed adoption would be in the best interests of the child. The dissent assumes, but provides no authority to support, the proposition that § 45a-764 gives the board authority to order a social worker to conduct an investigation of a proposed adoptive home. The dissent also unfairly denigrates the vital roles that the Probate Court and statutory parents play in statutory parent adoptions by asserting that in cases in which no waiver of the statutory parent requirement is sought, the Probate Court cannot provide the child "analogous protection safeguards" and by mischaracterizing statutory parent requirements as "paperwork," "filing a few papers" and "trivial detail" "a piddling technicality" and "clerical."

Fifth, the dissent's use of linguistic sleight of hand in part II B of its opinion to demonstrate that § 45a-764 was intended to mean that the board may waive not only the placement requirement, but also the statutory parent requirement, cannot withstand close scrutiny. In order to reach that interpretation, the dissent argues that the phrase "requirement that the . . . child be placed by the commissioner . . . or a child-placing agency" in § 45a-764 incorporates the definition of statutory parent. A statutory parent, however, is defined as "the commissioner . . . or the child-placing agency *appointed by the court* for the purpose of giving a minor child . . . in adoption . . . ." (Emphasis added.) General Statutes § 45a-707 (f). If § 45a-764 were to incorporate the definition of statutory parent, therefore, the

phrase "requirement that the minor child be placed by the commissioner . . . or a child-placing agency" in § 45a-764 would mean a requirement that the minor child be placed by the commissioner or a child-placing agency *appointed by the court*. The dissent ignores the impact of incorporating the additional language of § 45a-707 (f) into § 45a-764, perhaps because, under its construction, that same phrase "commissioner . . . or a child-placing agency" in § 45a-727 (a) also would mean "statutory parent," and therefore § 45a-727 (a) would mandate that the commissioner or a child-placing agency be appointed a child's statutory parent prior to the child being placed physically in a prospective adoptive home—a *narrow construction* that is unsupported by the language, legislative history or past applications of § 45a-727 (a). Thus, in concluding that it "can conceive of no clearer way to permit a waiver of the requirement of a statutory parent" than by authorizing the board in § 45a-764 to waive the requirement that a minor child be placed by "the commissioner . . . or a child-placing agency," the dissent completely disregards the significance of the fact that the legislature employed the words "commissioner . . . or a child-placing agency" instead of "statutory parent" in § 45a-764. Certainly, if the legislature had intended to refer to the child's statutory parent in § 45a-764, it could have made its intention clear by actually using the term "statutory parent."

Sixth, the dissent's reliance; see part II B of the dissenting opinion; on the definition of "placed for adoption" contained in § 45a-728-2 (h) of the Regulations of Connecticut State Agencies is misplaced. The definition on which the dissent relies applies to §§ 45a-728-1 through 45a-728-10 of the regulations, which in turn address the statutory placement mandate found in §§ 45a-728 and 45a-727 (a). "Placed for adoption" is defined in the regulation as "the act of giving . . .

*physical possession of a child* . . . to the prospective adoptive parent(s)"; (emphasis added); clearly referring to the process by which physical possession of the child is transferred to prospective adoptive parents, rather than to the legal procedure by which a child is given in adoption by a statutory parent. Thus, when taken in context, the word "giving" in the definition relied upon by the dissent undercuts, rather than supports, its argument that the term "placed by the commissioner . . . or a child-placing agency" in § 45a-764 means given in adoption by a statutory parent pursuant to § 45a-724 (a). Moreover, we reiterate once again that although "[o]rdinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [W]hen a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . *the agency is not entitled to special deference.*" (Citations omitted; emphasis added.) *Dept. of Administrative Services* v. *Employees' Review Board,* supra, 226 Conn. 678–79.

Seventh, in part II C of its opinion, the dissent, in its efforts to convert Malinda into a "spouse," sets forth reasons for the legislature's use of the word "spouse" in § 45a-724. Interestingly, the dissent provides not one citation to legislative history to support its observations regarding the legislature's rationale. Moreover, the dissent completely ignores legislative history that unequivocally indicates that word "spouse" was included in § 45a-724 pursuant to technical, rather than substantive, amendments to the adoption statutes and, therefore, continues to mean "spouse" as traditionally defined.[38]

---

[38] Prior to the technical amendment, the stepparent provision of the adoption statutes was specifically limited to adoption agreements between the child's sole legal parent and "the person with whom the *re-marriage shall be solemnized*" (emphasis added); General Statutes (1888 Rev.) § 473; General Statutes (1902 Rev.) § 235; see General Statutes (1918 Rev.) § 4880; General Statutes (1930 Rev.) § 4812; General Statutes (Cum. Sup. 1935) § 1581c; "the

We reiterate that in liberally construing a statute, we may not properly violate clearly expressed legislative intent.

Eighth, the dissent's criticism, in part IV of its opinion, that we have resorted to a "hypertechnical eighteenth century analysis that has no place in the jurisprudence of the twenty-first century" is unjustified. Even if the extensive legislative history predating the 1973 revision to the adoption statutes is put aside, the legislative history of the 1973 revision and subsequent revisions to the statutes still is replete with compelling evidence that § 45a-764 was not intended to provide the adoption review board with jurisdiction to waive the statutory parent requirement of § 45a-724 (a). See parts II B 2 and 3 of this opinion. In fact, as enacted in 1973, the adoption statutes excepted blood relative adoptions from the placement requirement but did not except such adoptions from the statutory parent requirement. See P.A. 73-156, §§ 10 and 12. Consequently, in 1974, the legislature found it necessary to amend the statutory parent requirement to include an additional exception for blood relative adoptions. See P.A. 74-164. That is indisputable evidence that the placement requirement is an entity separate and distinct from the statutory parent requirement. If the two requirements were intended to be synonymous, there would have been no need for the legislature to except blood relative adoptions from the statutory parent requirement because such adoptions already would have been excepted from the placement requirement. Thus, the legislative genealogy of the exceptions to the statutory parent requirement of § 45a-724 (a) fatally undercuts the dissent's argument that the board's authority to

person with whom *such remarriage or marriage is contracted*" (emphasis added); General Statutes (Sup. 1943) § 651g; General Statutes (1949 Rev.) § 6868; or "the person to whom *they are married*" (emphasis added); General Statutes (Rev. to 1975) § 45-61i; General Statutes (Rev. to 1979) § 45-61i.

waive the placement requirement of § 45a-727 (a) includes authority to waive the statutory parent requirement of § 45a-724 (a). The plain language of § 45a-764 (f), moreover, provides that upon the granting of a waiver by the board, the Probate Court shall include in the adoption decree a finding that the placement requirement of § 45a-727 has been waived. Surely, if the legislature had intended § 45a-764 to provide the board authority to waive not only the placement requirement, but also the separate and distinct statutory parent requirement of § 45a-724 (a), the legislature would have directed the Probate Court in § 45a-764 (f) also to include in its decree a finding that the statutory parent requirement of § 45a-724 (a) has been waived.

Last, the dissent takes liberties with the legislative history of § 45a-764, substituting the words "statutory parent" for the words "commissioner" and "agency" at will. Thus, the dissent reasons circularly, assuming its desired conclusion and then using that assumption as support for its conclusion. In our view, the dissent has not pointed to a single excerpt of legislative history that, when read in its original form and in context, supports the dissent's arguments, nor did our careful and thorough review of that history, both distant and recent, uncover any such support.

The judgment of the Superior Court, *Handy, J.*, dismissing the plaintiffs' probate appeal from the decision of the board is affirmed; the judgment of the Superior Court, *Handy, J.*, sustaining the plaintiffs' administrative appeal from the board's denial of a waiver of the placement requirement of § 45a-727 (a) (3) is reversed, and the case is remanded to the Superior Court sitting as a court of probate for further proceedings according to law.[39]

---

[39] General Statutes § 45a-186 (a) provides in relevant part: "Any person aggrieved by any order . . . of a court of probate in any matter . . . may appeal therefrom to the Superior Court . . . ." We previously have con-

In this opinion BORDEN, NORCOTT, KATZ, PALMER and MCDONALD, Js., concurred.

MCDONALD, J., concurring. I agree with the majority opinion. I only add that the legislature clearly has favored stepparent and blood relative adoptions over those by nonrelatives. In all adoptions, except where a stepparent adopts, all existing parental rights must be terminated. In stepparent adoptions, however, if the spouse has exclusive parental rights, those existing rights need not be terminated. Also, stepparents and blood relatives may adopt absent the prior placement of the child by the commissioner of children and families (commissioner) or a child-placing agency, which is required for other adoptions.

The plaintiffs imply that, in nonrelative adoptions, the adoption review board (board) may waive the termination of parental rights requirement under its authority to waive the requirement that the child be placed by the commissioner or child-placing agency. The board, however, cannot waive the placement requirement in a blood relative adoption since placement is not required for blood relative adoptions. Consequently, if this court were to accept the plaintiffs' argument, a blood relative would have to await a termination of parental rights to adopt while a nonrelative could apply for a waiver. The legislative preference for blood relative adoption, therefore, would be reversed in favor of adoption by an unrelated adoptive parent.

Moreover, if the legislature meant to give the board the authority to waive the requirement of termination of the biological parent's rights, it simply could have

cluded that a person whose constitutionally protected interests are adversely affected by an order of a court of probate is aggrieved within the meaning of § 45a-186 (a) and therefore may appeal from the order to the Superior Court pursuant to § 45a-186. *Erisoty's Appeal from Probate*, 216 Conn. 514, 522, 582 A.2d 760 (1990).

said so. It did not. If we so held, we would be creating legislation. I again observe that this court is not free to create legislation. See *Pamela B.* v. *Ment,* 244 Conn. 296, 347, 709 A.2d 1089 (1998) (*McDonald, J.,* dissenting).

The people alone create laws only through those they elect. We were not appointed to establish adoption and family policy. Those duties rest with the General Assembly and the governor, the representatives of the people. See *Claremont School District* v. *Governor,* 142 N.H. 462, 477–78, 703 A.2d 1361 (1997) (Horton, J., dissenting). Otherwise, we would have no need for the other branches of government, and the courts, not the people, would be the supreme political power. The people have not so constituted our state. Instead, they have provided: "All political power is inherent in the people, and all free governments are founded on their authority"; Conn. Const., art. I, § 2; and "[t]he legislative power of this state shall be vested in two distinct houses or branches; the one to be styled the senate, the other the house of representatives, and both together the general assembly." Id., art. III, § 1.

Accordingly, I concur.

BERDON, J., dissenting. The majority would have us believe that the only way Malinda could adopt Baby Z.—the child that she and Anne, her life partner, brought into this world—would be for Anne to terminate all of her legal rights to her biological child.[1] A reasonable construction of the statutory scheme governing adoptions in the state of Connecticut does not support this contention. Moreover, and of fundamental importance, the best interests and well-being of Baby Z. require that Malinda adopt him so that the three—Malinda, Anne and Baby Z.—can live together as a family unit with

---

[1] In order to protect their privacy, we refer to the plaintiffs in this appeal as "Malinda" and "Anne." See footnote 1 of the majority opinion.

legal ties.[2] As the amici curiae[3] point out in support of Malinda's effort to adopt Baby Z., "it is in the child's best interests to form legally sanctioned bonds with those functioning in parental roles."

The New York Court of Appeals—faced with a similar case wherein a lesbian sought to adopt the biological child of her life partner—framed the issue in practical terms: "[We must] decide if the unmarried partner of a child's biological mother, whether heterosexual or homosexual, who is raising the child together with the biological parent, can become the child's second parent by means of adoption. . . . [W]e answer this question in the affirmative. To rule otherwise would mean that the thousands of New York children actually being raised in homes headed by two unmarried persons could have only one legal parent, not the two who want them." *In the Matter of Jacob*, 86 N.Y.2d 651, 656, 660 N.E.2d 397, 636 N.Y.S.2d 716 (1995).

As I shall discuss more fully in this dissent, the majority reaches its "result driven conclusion"[4] by ignoring:

[2] Like other controversies we have recently been called upon to resolve, "[t]his is a case of first impression for this court, and it requires us to come to terms with changing family structures . . . ." *Doe* v. *Doe*, 244 Conn. 403, 458, 710 A.2d 1297 (1998) (*Katz*, J., with whom *Berdon* and *Peters*, Js., joined, concurring in part and dissenting in part).

[3] The amici curiae are: The National Association of Social Workers, The Connecticut Counseling Association, The Connecticut Society for Clinical Social Work, Inc., The Gay and Lesbian Parents Coalition International, Inc., The Village for Families and Children, Inc., Julia M. McNamara, Parents, Families and Friends of Lesbians and Gays, Inc., The Connecticut Women's Education and Legal Fund, Inc., Children of Lesbians and Gays Everywhere, Mark Abrahamson, Ph.D., Stephen Wizner, Esq., John Schowalter, M.D., Joseph B. Warshaw, M.D., A Child Among Us—The Center for Adoption, Inc., Gay and Lesbian Advocates and Defenders, The Connecticut Federation of Families for Children's Mental Health, Connecticut Council on Child And Adolescent Psychiatry, Inc., Connecticut Voices for Children, Mental Health Association of Connecticut, Inc., The Connecticut Psychiatric Society, The Center for Children's Advocacy, Inc., Julian B. Ferholt, M.D., Reverend Dr. Frederick J. Streets and Kathleen A. Sullivan.

[4] *Sheff* v. *O'Neill*, 238 Conn. 1, 55, 678 A.2d 1267 (1996) (*Borden*, J., with whom *Callahan* and *Palmer*, Js., joined, dissenting).

(1) the plain language of the relevant statutes; (2) the legislative history surrounding their enactment; (3) the state's own interpretation of the statutory scheme; (4) the well settled common-law principle that remedial statutes must be liberally construed in favor of those whom they are intended to protect; and (5) the legislative mandate that certain relevant statutes governing adoption in this state must be liberally construed in order to promote the best interests of the child. Moreover, the majority's narrow interpretation of the relevant statutes creates grave constitutional infirmities with the statutory scheme regulating adoptions in the state of Connecticut, and the disingenuous reasons advanced to justify the refusal to reach these constitutional issues cannot withstand scrutiny.

Finally, as three members of the majority recently asserted in a case that also involved the best interests of children, I believe that my colleagues have "[renounced] this Court's historical commitment to a conception of the judiciary as a source of impersonal and reasoned judgments . . . . In essence, [p]ower, not reason, is the new currency of this Court's . . . decisionmaking." (Citation omitted; internal quotation marks omitted.) *Sheff* v. *O'Neill*, 238 Conn. 1, 55–56, 678 A.2d 1267 (1996) (*Borden, J.*, with whom *Callahan* and *Palmer, Js.*, joined, dissenting).

The decision of the majority tramples upon the constitutional rights of gay and lesbian parents—who are not permitted to marry under Connecticut law—and heterosexual parents who elect to remain unmarried.[5]

---

[5] The scope of today's holding by the majority goes far beyond the homosexual community. See footnote 47 of this dissent. Whether or not the majority realizes it, the court's judicial redrafting of the adoption laws will prohibit the heterosexual partner of an unmarried biological parent from adopting a child through the waiver provision of General Statutes § 45a-764. This will deprive a countless number of children of the benefit of having legal ties to both of their parents, a status that is contrary to their best interests. See part I of this dissent.

It does so by resorting to a hypertechnical eighteenth century analysis that has no place in the jurisprudence of the twenty-first century. Future generations will look back upon the majority's decision today with the same opprobrium with which we regard the draconian absurdities of the early English common law. Unfortunately, this observation will provide little solace to young Baby Z., his family, or those who are similarly situated.

I

I begin with the trial court's emphatic determination that it had "no doubt . . . that the present adoption would be in Baby Z.'s best interests."[6] *In re Baby Z.*, 45 Conn. Sup. 33, 41, 699 A.2d 1065 (1996) (*Austin, J.*). The Probate Court, the department of children and families of the state of Connecticut, and Professor Barbara Nordhaus, an adoption expert from the faculty of the Child Study Center at the Yale School of Medicine,[7]

---

[6] The plaintiffs initiated this litigation by petitioning the Probate Court for an adoption order granting Malinda legal custody of Baby Z. without disturbing Anne's legal relationship with him as his biological mother. The Probate Court denied the petition. Upon consideration of the plaintiffs' appeal, the trial court, *Austin, J.*, agreed with the Probate Court that it could not approve of the adoption under General Statutes § 45a-724. *In re Baby Z.*, 45 Conn. Sup. 33, 46, 699 A.2d 1065 (1996). Nevertheless, the trial court concluded that the requirements of § 45a-724 could be waived by the adoption review board (board) pursuant to General Statutes § 45a-764. Id., 47. Accordingly, the trial court issued the following order: "[T]he appeal is remanded to the Probate Court with direction to refer the matter to the [board] . . . . Upon waiver, the Probate Court is further directed to grant the adoption . . . ." Id., 57.

The board refused to grant the waiver on the ground that it lacked jurisdiction, and the plaintiffs appealed. On appeal, the trial court, *Handy, J.*, agreed with Judge Austin that the board had jurisdiction to grant a waiver. *In re Baby Z.*, Superior Court, judicial district of New London at Norwich, Docket No. CV960110941S (September 17, 1997) 20. Accordingly, Judge Handy ordered that the application be returned to the board for a waiver determination, then proceed as set forth in Judge Austin's opinion. Id., 21. The present appeals followed.

[7] Nordhaus is "a licensed social worker, psychotherapist and professor in social work at the Yale Child Study Center, which is the Department of

all formed the identical opinion that the proposed adoption is in the best interests of Baby Z. Id., 43. Having independently reviewed the record, I am firmly convinced that it is essential for Baby Z.'s well-being that both of his mothers—Malinda and Anne—have a legal, parental relationship with him. I reach this conclusion on the basis of the following undisputed facts.

Malinda and Anne have lived together as life partners for more than ten years. They decided to expand their family, and together they planned for the birth of their son. In the course of this planning, Anne and Malinda discussed the profound ways in which their lives would be forever changed after they had a baby. Together, they decided that Anne would take maternity leave to provide primary care for their child and that Malinda would continue to work to support their family. Id., 35.

Baby Z., who was conceived by artificial insemination,[8] was born to Anne on May 10, 1992. Since the time of their son's birth, Malinda and Anne have shared all of the joys and burdens associated with bringing a new life into the world, including "all emotional, financial and other parenting responsibilities . . . ." Id., 34. Malinda regards Baby Z. as her son, and Baby Z. calls her "Mama." Id., 36.

The trial court concluded that, "[w]hen it comes to making decisions regarding Baby Z. and his welfare, that is . . . done jointly, honestly and, most importantly, in the child's best interests." Id., 35. It is unchallenged that Malinda has played an intimate and indispensable role in the conception, care and rearing of her son, and that she will continue to do so for as long as she lives.

Child Psychiatry at Yale School of Medicine . . . . The court accepted the proffer of Nordhaus as an expert in the field of child placement and adoption based upon her impressive credentials." *In re Baby Z.*, supra, 45 Conn. Sup. 35 n.3.

[8] The parental rights of the sperm donor were terminated before the plaintiffs filed the petition for adoption.

In short, Malinda is Baby Z.'s mother in every sense but the biological.

Malinda's family also regards Baby Z. as her son. "Malinda's father testified and gave [the] court a good overview of the love and support that this family has received from the extended family on all sides. He indicated that Baby Z. calls him 'Grandpa' and that he often referred to Baby Z. as his first grandchild. In fact, he stated that he was thrilled by the birth of his first grandchild, that he enjoys taking Baby Z. on plane rides and that he enjoys other play activities with the child as well. It was apparent that Malinda's father was very supportive of his daughter and as proud of her and Baby Z. as any father or grandfather would or could be." Id., 36.

Professor Nordhaus testified that Baby Z. would suffer if the adoption were denied. Id., 33. She explained her conclusion as follows: "[The goal is to] determin[e] what is best for any given child. That means what will enhance any given child's capacity to reach his or her maximum potential in development. And what's important for kids is security, continuity, affectionate ties. And that is why in this case . . . what is of primary importance, what is central here, is [that], by allowing [Baby Z.] to be legally adopted by [Malinda] we enhance the possibility [that he will reach his] . . . maximum development potential." (Internal quotation marks omitted.) Id., 37.

In contrast, "[i]t was [Professor Nordhaus'] experience that children who were never adopted by the 'parents' they lived with did not develop their optimum potential. They were left with a feeling of being 'unwanted' and thereby were developmentally deprived." Id., 36.

In short, Professor Nordhaus' expert opinion was that "[a]doption is really the only permanent way to

safeguard the ties [between Baby Z. and his two mothers]. It's the ideal way; it's the best way. It's the best thing for [Baby Z.]." (Internal quotation marks omitted.) Id., 37.

The trial court concluded that allowing Malinda to formalize her status as the mother of her son would "maximize his potential for a stable and loving relationship with the two people who want to be recognized as his parents . . . ." Id., 56–57. Neither Malinda nor Anne is engaging in this litigation in order to encourage respect for gays and lesbians or to grind any other ideological axe. Id., 35 n.4. Instead, Baby Z.'s two mothers seek only to obtain the benefits of legal adoption within their own family. Their six year old son's "long term well-being [is their] paramount concern." Id.

Judge Austin found as a matter of fact that the best interests of Baby Z. would be promoted by allowing Malinda to formalize her relationship with her son. The evidence supporting this finding is overwhelming and, as previously discussed, every person and agency that has considered the question (including the state of Connecticut) has reached the same conclusion. Moreover, General Statutes § 45a-764 (g)[9] specifically identifies the evil that the adoption statutes were designed to avoid—obtaining children by illegal means through black market adoptions—and this has absolutely nothing to do with the present case.[10] Having reviewed the plain language of our adoption laws, the legislative history, and the public policy concerns reflected therein, I am persuaded that Malinda is not precluded from adopting Baby Z.

## II

Under General Statutes § 45a-724,[11] the following persons may give a child in adoption, subject to certain

---

[9] As indicated by the majority in footnote 3 of its opinion, all references to General Statutes §§ 45a-706 through 45a-764 are to the 1995 revision.

[10] For the full text of § 45a-764, see footnote 9 of the majority opinion.

[11] For the full text of § 45a-724, see footnote 8 of the majority opinion.

limitations: (1) a statutory parent—that is, the commissioner of children and families (commissioner) or a child-placing agency appointed by the court; (2) a biological or adoptive parent (to his or her spouse); and (3) the guardian of a child free for adoption (to a blood relative).

I agree with the trial court that, pursuant to § 45a-764, the adoption review board (board) may waive the requirement that a statutory parent give Baby Z. in adoption and thus may authorize the Probate Court to approve Malinda's adoption of him. Alternatively, Anne (as a biological mother) may allow Malinda (as her spouse) to adopt Baby Z. Before analyzing these two procedural routes in detail, I will first discuss the fundamental requirement that this court must engage in liberal construction in order to promote the best interests of Baby Z.

A

Although I am of the opinion that the plain language of § 45a-764 authorizes the board to waive the requirement of a statutory parent,[12] it cannot be disputed that a liberal construction of the relevant statutes permits Malinda to adopt Baby Z. The majority does not dispute this latter proposition, but rather refuses to engage in liberal construction for reasons that I can only characterize as pretextual.

It is a well settled principle of the common law that the provisions of statutes such as those regulating adoption "should be construed liberally in favor of those whom [they are] intended to protect." *Dysart Corp.* v. *Seaboard Surety Co.*, 240 Conn. 10, 18, 688 A.2d 306 (1997). In addition, the legislature has mandated that certain statutes relevant to this case "shall be liberally construed in the best interests of [the] child . . . ."

---

[12] See part II B of this dissent.

General Statutes § 45a-706.[13] Incredibly, the majority disregards both this well settled common-law principle and this express legislative mandate.

The majority's feeble argument against liberal construction cannot withstand scrutiny: it merely asserts that "the best interests of a child cannot transcend statutorily defined jurisdictional boundaries." I agree, but this proposition has absolutely nothing to do with the present appeal. This case is about *construing* —rather than transcending—the jurisdiction of the board. In other words, this case does not involve clear statutory boundaries that we may not transcend. Instead, it is our duty to *determine* the jurisdictional boundaries of the board, a duty that we must exercise by examining the plain language of the relevant statutes and—if the plain meaning does not clearly authorize the proposed adoption—by liberally construing those statutes in a way that furthers the best interests of Baby Z.

The majority cannot refute this conclusion. In lieu of analysis, the majority leapfrogs from the unremarkable premise that the best interests of the child cannot transcend jurisdictional boundaries to the preposterous claim that this court need not engage in liberal construction in order to determine the limitations of the board's jurisdictional boundaries. In support of this non sequitur, the majority cites five cases. None of these cases suggests that we may ignore the dual mandate of liberal construction. Moreover, three of these cases cited by the majority involve workers' compensation benefits,[14]

---

[13] General Statutes § 45a-706 provides in relevant part: "Rule of construction. The provisions of sections . . . 45a-706 to 45a-709, inclusive, 45a-715 to 45a-718, inclusive, 45a-724 to 45a-734, inclusive, 45a-736, 45a-737 and 52-231a shall be liberally construed in the best interests of any child for whom a petition has been filed under said sections."

[14] *Discuillo* v. *Stone & Webster*, 242 Conn. 570, 698 A.2d 873 (1997); *Kinney* v. *State*, 213 Conn. 54, 566 A.2d 670 (1989); and *Castro* v. *Viera*, 207 Conn. 420, 541 A.2d 1216 (1988).

and thus have nothing to do with adoption.[15] While the remaining two cases cited by the majority do pertain to adoption, this court neither discussed nor engaged in liberal construction in either case.[16]

The majority cites two additional cases, each of which was decided generations ago. The sixty-eight year old case of *Goshkarian's Appeal*, 110 Conn. 463, 471, 473, 148 A. 379 (1930)—which provides that the statutory scheme governing adoption must be strictly construed because adoptions were unknown at common law—can not possibly trump the will of the legislature, which has since expressly directed this court to

[15] Significantly, the statutes regulating workers' compensation are not governed by a legislative mandate of liberal construction comparable to that contained in § 45a-706.

[16] In *Doe* v. *Doe*, 244 Conn. 403, 423, 710 A.2d 1297 (1998), on the same page to which the majority directs our attention, the court expressly states that "our task in the present case is *not* to determine what . . . would be in the child's best interest . . . ." (Emphasis added.) That, of course, is the precise task before the court in the present case. Accordingly, *Doe* is not pertinent.

*Castagno* v. *Wholean*, 239 Conn. 336, 684 A.2d 1181 (1996), can also be readily distinguished. In *Castagno*, this court rejected the argument—asserted by grandparents who sought visitation rights—that "the application of [the relevant statute] is not limited by any threshold requirements, and that the sole criterion for application of the statute is the best interest of the child." Id., 339. In the present case, it is our duty pursuant to the legislative mandate of § 45a-706 to *interpret* threshold requirements by reference to the best interests of the child. The court prefaced its statutory construction in *Castagno* by emphasizing the obligation to adhere to the "fundamental objective . . . to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) Id. In the present case, this duty requires us to obey the express legislative mandate that we liberally construe the underlying statutes that define the jurisdiction of the board in a fashion that promotes the best interests of Baby Z.

Elsewhere, the majority also cites *Killen* v. *Klebanoff*, 140 Conn. 111, 116, 98 A.2d 520 (1953), in which this court declared an adoption void on the ground that the spouse of the woman to whom the child was given in adoption did not consent to the adoption. Because both Anne and Malinda have consented to the proposed adoption and the parental rights of the sperm donor have been terminated (see footnote 8 of this dissent), *Killen* is not relevant.

liberally construe certain adoption statutes in the best interests of the child. Furthermore, it is ridiculous for the majority to rely on the century old case of *Johnson* v. *Terry*, 34 Conn. 259 (1867). It is revealing that the *Johnson* court cited as "elementary law" the proposition that "the father is entitled to the custody and control of his minor children, even to the exclusion of the mother," simply because he is a man. Id., 263.

In short, none of the cases cited by the majority justifies its refusal to engage in liberal construction in this case. In light of both the common law and the express mandate of the legislature, this refusal cannot be attributed to anything other than hostility to the proposed adoption.

I now turn to the two procedural avenues by which the proposed adoption may proceed—that is, (1) having the board waive the requirement of a statutory parent and (2) having Anne, as a biological mother, give Baby Z. in adoption to Malinda, as her spouse.

B

Although Baby Z. does not have a statutory parent—because Anne is his biological mother and her parental rights have not been terminated[17]—the requirement of a statutory parent may be waived. Pursuant to § 45a-764 (a), the board "may . . . for cause shown that it is in the best interests of the minor child, waive the requirement that the minor child be placed by the commissioner of children and families or a child-placing agency."[18] This language incorporates the statutory definition of the term "statutory parent."[19] Substituting the

---

[17] General Statutes § 45a-718 provides in pertinent part that a statutory parent may be appointed only "[i]f a child is free for adoption . . . ." Pursuant to General Statutes § 45a-725 (c), Baby Z. cannot be "free for adoption" unless "all parental rights have been terminated under Connecticut law . . . ." For the full text of § 45a-725, see footnote 18 of the majority opinion.

[18] For the full text of § 45a-764, see footnote 9 of the majority opinion.

[19] "Statutory parent" is defined, in General Statutes § 45a-707 (f), as *"the commissioner of children and families or [a] child-placing agency*

term for its definition, § 45a-764 (a) authorizes the board to "waive the requirement that the minor child be placed by [a statutory parent]."

The majority advances the argument that, although the board *may* waive the requirement that a statutory parent—who has already been appointed—must be the agent who places a child for adoption, the board does *not* possess the authority to waive two alleged requirements that are not mentioned in the text of § 45a-764: (1) the requirement that a child must have a statutory parent in order to be eligible for adoption; and (2) the requirement that a statutory parent must file an application for adoption and a written agreement. The majority thus implies that Malinda and Anne cannot obtain joint legal custody of Baby Z. unless three conditions are first satisfied: (1) Anne must terminate her parental rights to Baby Z.;[20] (2) a statutory parent must be appointed to represent Baby Z.; and (3) that statutory parent must file certain paperwork with the Probate Court.

The plain language of § 45a-764 (a) does not support the reading that the majority seeks to impose upon it. The statute authorizes the board to "waive the requirement that the minor child be placed by [a statutory parent]." The majority claims that the legislature implicitly limited this waiver to the requirement that a statutory parent—who has already been appointed and filed certain paperwork—must place the child. The text of § 45a-764 (a), however, plainly authorizes the board to waive the requirement that a statutory parent must be

---

appointed by the court for the purpose of giving a minor child or minor children in adoption . . . ." (Emphasis added.) The emphasized portion of this definition is quoted verbatim in the text of § 45a-764 (a).

[20] See part III and footnote 39 of this dissent for discussions of the grave constitutional consequences associated with the requirement that a statutory parent be appointed in this case.

appointed.[21] I can conceive of no clearer way to permit a waiver of the requirement of a statutory parent than by authorizing the board to "waive the requirement that the minor child be placed by [a statutory parent]." General Statutes § 45a-764 (a). If the legislature had intended to limit the authority of the board to waiving only the placement requirement (but *not* the requirement of a statutory parent) the statutory language would embody this intention. The text of the statute that the legislature actually enacted contains no language that evinces such an intention.

Furthermore, the way in which the legislature structured the board supplies compelling evidence that the board may waive the requirement of a statutory parent. Pursuant to General Statutes § 45a-763, the board consists of the Probate Court administrator, the commissioner, and an officer of a child-placing agency located in the state and licensed by the commissioner.[22] In other words, the board consists of (1) a representative of the court that appoints statutory parents and (2) representatives from *both* of the only two offices from which the court may appoint a statutory parent. Because these potential statutory parents are already members of the board that must approve a waiver, a child such as Baby Z. would gain no additional quantum of protection by having the court appoint one of them as an official statutory parent. In their capacities as statutory parents,

---

[21] If no statutory parent is necessary, it follows a fortiori that the application and agreement need not be filed by a statutory parent.

[22] General Statutes § 45a-763 provides in pertinent part: "Adoption Review Board established. (a) An Adoption Review Board is established, to consist of the commissioner of children and families or his designee, the probate court administrator or his designee, and an officer of a child-placing agency which is located in the state and licensed by the commissioner of children and families . . . .

"(b) Each designee or officer shall be a person who is familiar with and experienced in adoption procedures, policies and practices. . . ."

For the full text of § 45a-763, see footnote 14 of the majority opinion.

the commissioner or an officer from a child-placing agency would be required to make the same determinations that they are already called upon to make as members of the board. Setting aside labels, the identical entities are considering the identical issues: whether the proposed adoption (1) is in the best interests of the child and (2) comports with the public policy of this state against black market adoptions.[23] The evidentiary hearing before the board thus provides a method by which the commissioner and an officer of a child-placing agency may elect to waive the requirement that one of them be appointed as a statutory parent.[24] To use a concrete example, it would be foolish for the legislature to provide that the commissioner could not proceed with a proposed adoption because—even though the commissioner is a member of the board reviewing the merits of the proposed adoption—he or she has not technically been appointed as a statutory parent. See, e.g., *Hartford Electric Light Co.* v. *Water Resources Commission*, 162 Conn. 89, 103, 291 A.2d 721 (1971) ("[w]here a statute is open to two constructions, one of which would have an absurd consequence, a legislative intent to attain a rational result may be assumed"). Unlike my colleagues in the majority, I am unwilling to ascribe foolishness to the drafters of § 45a-764.

In light of the composition of the board, the majority's notion that the board can waive only the placement requirement makes no sense. If the board were to waive only the requirement that a statutory parent must place

[23] Pursuant to § 45a-764 (g), a waiver of the statutory parent requirement may not be granted "if the board determines that the adoption proceeding would violate the public policy of the state against the obtaining of children by illegal means for adoption purposes."

[24] To be perfectly clear, § 45a-763 (a) provides that the board consists of "the commissioner of children and families . . . and an officer of a child-placing agency," and § 45a-764 (a) authorizes the board to "waive the requirement that the minor child be placed by the commissioner of children and families or a child-placing agency."

a child (but *not* the requirement that a statutory parent must give a child in adoption) then nothing would remain for the statutory parent to do, aside from performing the perfunctory clerical task of filing certain paperwork. The board—which consists of representatives from the only two offices from which a statutory parent may be appointed—would already have conducted a rigorous evidentiary hearing. If necessary, the board could have ordered a social worker to perform a field investigation and testify before the board. Furthermore, after a waiver has been granted, the Probate Court retains the ultimate authority to rule upon the merits of a proposed adoption,[25] thus affording yet another layer of protection to ensure that the best interests of the child are vigorously protected.

The majority has failed to indicate what substantive task the members of the board could possibly perform as statutory parents that they would not already have performed in their capacities as members of the board. In fact, the procedures associated with a waiver of the requirement of a statutory parent afford a child *more* protection than the procedures associated with having a statutory parent. In order to grant a waiver, the board must conduct an evidentiary hearing in order to determine that the proposed adoption is in the best interests of the child. No analogous protection safeguards the interests of children who do not seek waivers from the board.

[25] Pursuant to § 45a-764 (b), "[a]ny judge of probate who has had presented to him an application for adoption which may not proceed because the child has not been . . . placed [by a statutory parent] may apply in writing to the [board] for a waiver of such requirement." If the board elects to grant a waiver, § 45a-764 (e) provides in pertinent part that the chairperson of the board "shall notify the court of probate that the adoption may proceed and that the requirement of placement by [a statutory parent] is waived." The Probate Court then retains discretion to either grant or deny the proposed adoption. General Statutes § 45a-764 (f) ("*If* the court of probate thereafter grants the adoption application . . . ." [Emphasis added.]).

Setting aside the clerical task of filing a few papers, a waiver of the placement requirement is indistinguishable from a waiver of the requirement of a statutory parent. Nevertheless, the majority proposes that the board *may* waive the weighty requirement that a statutory parent must place a child in a good home, but may *not* waive the trivial detail that a statutory parent must deliver some paperwork to the Probate Court. Articulated in these terms, it becomes starkly apparent that the majority's construction of the relevant statutes has concocted a paradox: the board may waive a vitally important requirement—one that lies at the heart of the reason why we have statutory parents—but not a piddling technicality, the greater but not the lesser. The legislature could not possibly have intended this absurd result.

Significantly, the majority does not even attempt to make the argument that the text of § 45a-764 (a) precludes the board from waiving the requirement of a statutory parent. Instead, the majority extracts two purportedly unwaivable requirements from two *other* statutes. Each of these two statutory provisions is expressly subject to the legislative mandate of General Statutes § 45a-706. Accordingly, each must be "liberally construed in the best interests of [the] child . . . ." General Statutes § 45a-706; see *In re Bruce R.*, 234 Conn. 194, 207, 662 A.2d 107 (1995) ("the mandate of § 45a-706 compels the conclusion that the legislature intended that the best interest of the child be construed generously and broadly, rather than strictly and narrowly"). In addition, both statutes are remedial; accordingly, they would be subject to liberal construction under the common law, even without § 45a-706.[26] See, e.g., *Dysart Corp.* v. *Seaboard Surety Co.*, supra, 240 Conn. 18. The majority ignores both this legislative mandate and this well settled common-law principle. I interpret this

---

[26] We must liberally construe § 45a-764 as well, for the same reason.

silence as a tacit concession by the majority that a liberal construction of the adoption statutes allows Malinda to adopt Baby Z.

A liberal construction is one that "expands the meaning of the statute to meet cases which are clearly within the spirit or reason of the law . . . provided such an interpretation is not inconsistent with the language used. It resolves all reasonable doubts in favor of the applicability of the statute to the particular case." Black's Law Dictionary (6th Ed. 1990). There is no question that permitting Malinda to adopt Baby Z. is "within the spirit . . . of the law." Id. In fact, no one in the course of this litigation has ever denied that such an adoption would promote the best interests of the child, which is the sole reason for the adoption laws. As I shall demonstrate herein, permitting Malinda to adopt Baby Z. is—at a bare minimum—"not inconsistent with the language" of the relevant statutes.

Viewed through the lens of liberal construction, the majority's two "unwaivable requirements" dwindle down to nothing. First, the majority focuses on § 45a-724 (a) (1), which provides that a statutory parent may "*give*" a child in adoption. (Emphasis added.) The majority argues that, because § 45a-764 (a) only authorizes the board to "waive the requirement that [a] minor child be *placed* by [a statutory parent]" (emphasis added), the board cannot waive the requirement that a statutory parent must *give* a child in adoption.

The observation that the words "give" and "place" are synonymous hardly requires construction at all, let alone a liberal one. Indeed, the state's own regulations, promulgated by the department of children and families, define "[p]lace for adoption" and "placement for adoption" as "the act of *giving* . . . physical possession of a child or children to the prospective adoptive

parent(s) . . . ."[27] (Emphasis added.) Regs., Conn. State Agencies § 45a-728-2 (h), promulgated pursuant to General Statutes § 45a-728.[28] Because "give" and "place" are interchangeable, § 45a-724 (a) falls squarely within the orbit of the waiver provision of § 45a-764 (a). In other words, § 45a-724 (a) provides that a statutory parent is required to place a child, and § 45a-764 (a) authorizes the board to waive this provision in the best interests of the child. It is apparent that recognizing the way in which §§ 45a-724 (a) and 45a-764 (a) dovetail with one another is "not inconsistent with the language used."[29] Black's Law Dictionary (6th Ed. 1990).

Second, the majority focuses upon the requirement of General Statutes § 45a-727 (a) (1) that "[e]ach adoption matter shall be instituted by filing an application in a court of probate, together with the written agreement of

[27] General Statutes § 4-170 provides in pertinent part: "(b) No adoption, amendment or repeal of any regulation . . . shall be effective until the original of the proposed regulation approved by the Attorney General . . . [has] been submitted to the standing legislative regulation review committee . . . .

"(c) The committee shall review all proposed regulations and, in its discretion . . . may approve [or] disapprove . . . any such regulation. . . ."

The fact that the legislature has ratified a proposed regulation " 'supports the position that the regulation is consistent with the general statutory scheme that the regulation was designed to implement.' *Texaco Refining & Marketing Co.* v. *Commissioner*, 202 Conn. 583, 600, 522 A.2d 771 (1987); see also *Phelps Dodge Copper Products Co.* v. *Groppo*, 204 Conn. 122, 129–30, 527 A.2d 672 (1987); *Connecticut Hospital Assn., Inc.* v. *Commission on Hospitals & Health Care*, 200 Conn. 133, 144, 509 A.2d 1050 (1986)." *Caldor, Inc.* v. *Heslin*, 215 Conn. 590, 599, 577 A.2d 1009 (1990), cert. denied, 498 U.S. 1088, 111 S. Ct. 966, 112 L. Ed. 2d 1053 (1991).

[28] General Statutes § 45a-728 provides in pertinent part: "[T]he commissioner of children and families shall adopt regulations . . . concerning adoption placement of children who have been identified or located by prospective adoptive parents. . . ."

[29] Furthermore, nothing in the text of § 45a-724 suggests that the list of those who may give a child in adoption has anything at all to do with the jurisdiction of the board. Accordingly, the absence of a statutory parent in this case does not preclude the board from reviewing the merits of the proposed adoption.

adoption . . . ." The majority claims that these papers must be filed by a statutory parent. Significantly, the statute does not contain this technicality. Accordingly, it is of no moment that a statutory parent did not file the relevant paperwork in this case. Even if the statute did contain such a technicality, § 45a-764 (a) provides that, "*[n]otwithstanding the provisions of section 45a-727*, the [board] may . . . waive the requirement that the minor child be placed by [a statutory parent]." (Emphasis added.) The emphasized language clearly authorizes the board to proceed with an adoption that is not accompanied by the paperwork referred to in § 45a-727 (a) (1), let alone accompanied by paperwork filed by a particular individual or agency.[30]

If there were any doubt about the conclusion that the board may waive both of the majority's purported "requirements," the mandate of liberal construction would be sufficient to dispel it. Baby Z.'s best interests are well represented by his biological mother; by her life partner; by the Probate Court; and by the members of the board who must approve the adoption—the Probate Court administrator, the commissioner and an officer of a licensed child-placing agency—all of whom are "familiar with and experienced in adoption procedures, policies and practices." General Statutes § 45a-763 (b). In such a circumstance, it would be pure formalism to thwart Malinda's adoption of Baby Z. on the ground that a statutory parent has not been appointed, particularly since representatives from the only offices from which statutory parents may be appointed are already members of the board that must determine whether the proposed adoption is in the best interests of the child. More importantly, there are grave consequences associated with the appointment of a statutory parent, including the requirement that Anne sever all legal rights to her

---

[30] Nothing in the text of § 45a-727 suggests that the filing of an application and an agreement has anything at all to do with the jurisdiction of the board.

biological son.[31] Accordingly, Baby Z.'s best interests would be promoted by a waiver of the requirement of a statutory parent. Principles of liberal construction instruct us to "expan[d] the meaning of the statute" in order to achieve this result; Black's Law Dictionary (6th Ed. 1990); as I have demonstrated previously herein, such expansion is hardly necessary in this case.

Three members of today's majority (*Callahan, C. J.,* and *Norcott* and *Katz, Js.*) have recently engaged in liberal construction pursuant to § 45a-706 in order to promote the best interests of a child. It is difficult to understand their refusal to do so in the present case. In *In re Bruce R.,* supra, 234 Conn. 194, Justice Norcott, writing for a unanimous court, functionally redrafted General Statutes § 45a-717 (f)—the statute governing consensual termination of parental rights—in order to comply with the mandate of liberal construction contained in § 45a-706. Although we recognized in that case that "no statute describes the factors that must be considered" when evaluating the best interests of the child; id., 205; we held that "the trial court *must* consider the financial condition of the parents as one of the factors in determining the best interest of the child in contested consensual petitions to terminate parental rights." (Emphasis added.) Id., 214–15. Our reliance in *In re Bruce R.* on § 45a-706 to insert a requirement into the statutory framework compels the less drastic measure of interpreting the board's statutory authority to permit a waiver of the requirement of a statutory parent in circumstances such as those presented in this case— a waiver that can be made only after the board has conducted an evidentiary hearing and determined that the adoption is in the best interests of the child. Significantly, the majority has made no effort to distinguish *In re Bruce R.*

---

[31] The consequences associated with the appointment of a statutory parent are discussed more fully in footnote 39 and part III of this dissent.

The majority claims that, in this case, its hands are tied by legislative history. The history surrounding the enactment of the waiver statute, however, supplies further evidence of my view that the board may waive the requirement of a statutory parent. In constructing its argument to the contrary, the majority relies upon two excerpts from the legislative history of § 45a-764, neither of which addresses the purportedly unwaivable requirements that the majority has invented. The majority quotes Judge Knierim, who remarked that, " '[a]s a result of the new adoption law, there are children living in homes where it is technically impossible to proceed with an adoption. Unless the child was actually *placed . . . by [a statutory parent]*, an adoption may not proceed under the new adoption law.' " (Emphasis altered.) The majority also quotes a similar observation made by Representative James T. Healey: " '[T]here are a small number of meritorious cases where the child, in fact, was not *placed [by a statutory parent]*. And up until now we have had no way whatsoever of dealing with that particular situation.' " (Emphasis in original.) The emphasized language recites verbatim the wording of § 45a-764, which provides that the board may "waive the requirement that the minor child be *placed by [a statutory parent]*." (Emphasis added.) Accordingly, the only two portions of legislative history to which the majority has called our attention suggest that the board may waive the requirement of a statutory parent, for the reasons discussed above.

My independent review of the record has revealed that affirmative statements in the legislative history of the waiver provision support my view. Judge Knierim— the probate court administrator who was the architect of the legislation that created the board—repeatedly stated in very general terms that he designed the waiver provision to remedy the inequities created by the strict

requirements of the adoption statutes.[32] This broadly articulated intention to avoid unfair results is entirely consistent with the plain language of § 45a-764, the composition of the board, and my conclusion that the board possesses the authority to waive the requirement of a statutory parent. Nowhere does Judge Knierim (or anyone else) either state or imply anything that provides even the faintest support for the paradox that the majority has concocted. Accordingly, there is no reason to believe that the legislature intended to authorize the board to waive the placement requirement—which guts the entire purpose of having a statutory parent—but not the requirement that a statutory parent perform the purely clerical task of filing some paperwork with the Probate Court.

Other states have endorsed adoptions similar to Malinda's proposed adoption of Baby Z. The Supreme Court of Vermont has explained that, "[w]hen social

---

[32] Judge Knierim made the following statements: "I know of specific cases . . . where adoption would be the best thing in the world for [a] child. . . . [W]hen we have these children who really should be in the adoption process, who can't be, we have to find a safety valve someplace." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1975 Sess., p. 426. "[I]njustices have resulted and I propose . . . to set up [the] . . . board to review these hardship cases. And if it's clear that [an adoption is] not black market but rather that the circumstances that brought this child into the home are justifiable, then we can proceed with an adoption." Id., p. 21. "I think if the three main groups that are concerned with adoptions are put together on [the] board . . . to review these cases on an individual basis just to see where . . . the requirement should be waived I think we will help a great many children who are right now in limbo." Id., p. 427.

In his capacity as chief counsel to the joint committee on the judiciary, Justice Borden remarked that "the legislative policy . . . [was] . . . simply to get at those isolated hardship . . . cases where the regular means seem to get in the way." Id., p. 440.

Finally, Representative Healey explained that, "[i]n the event that a petition is made to a judge of probate where the condition precedent of placement by [a statutory parent] has not been met, then if the judge of probate feels that despite the fact that this condition has not been met . . . the application is meritorious, he may refer the application to [the] board [for a waiver]." 18 H.R. Proc., Pt. 5, 1975 Sess., p. 2386.

mores change, governing statutes must be interpreted to allow for those changes in a manner that does not frustrate the purposes behind their enactment. To deny the children of same-sex partners . . . the security of a legally recognized relationship with their second parent serves no legitimate state interest." *In re B.L.V.B.*, 160 Vt. 368, 375, 628 A.2d 1271 (1993).

As mentioned previously, the New York Court of Appeals has also held that a lesbian may obtain joint legal custody of the biological child of her life partner. *In the Matter of Jacob*, supra, 86 N.Y.2d 656. The court reached this result by invoking its "primary loyalty . . . to the statute's legislative purpose—the child's best interest." Id., 658. The court cogently explained that the policy concerns justifying the extraordinary measure of terminating a biological parent's rights when his or her child is adopted by *strangers* disappear when the biological parent is a party to the adoption. When strangers adopt a child, "there is a need to prevent unwanted intrusion by the child's [biological family] to promote the stability of the new adoptive family," and terminating the parental rights of the biological parents furthers this objective. Id., 665. In the present case, in contrast, Anne is an integral and indispensable member of the proposed adoptive family. Because it is absurd to suggest that Anne could "intrude" into her own family, there is no reason to terminate Anne's parental rights to her biological son before permitting her and Malinda to obtain joint legal custody of him. As a trial court in New York emphasized, termination of parental rights in the circumstances of this case "would be an absurd outcome which would nullify the advantage sought by the proposed adoption: the creation of a legal family unit identical to the actual family setup." *In the Matter of Adoption of Evan*, 153 Misc. 2d 844, 848, 583 N.Y.S.2d 997 (1992).

Similar decisions approving of adoptions by lesbian and gay parents have been rendered across the country. See *In re M.M.D.*, 662 A.2d 837, 859–61 (D.C. 1995); *In re Petition of K.M.*, 274 Ill. App. 3d 189, 203–204, 653 N.E.2d 888 (1995) (citing unreported decisions from other states); *Adoption of Tammy*, 416 Mass. 205, 216–17, 619 N.E.2d 315 (1993); *In the Matter of Adoption of Two Children By H.N.R.*, 285 N.J. Super. 1, 6–8, 666 A.2d 535 (1995); *In re B.L.V.B.*, supra, 160 Vt. 372–74.

The courts of only two states—Wisconsin[33] and Colorado[34]—have rendered contrary decisions. Each of those two courts expressly declined to consider the best interests of children, an approach that violates the mandate of § 45a-706 that Connecticut's adoption statutes "shall be liberally construed in the best interests of [the] child . . . ."

In sum, the board has jurisdiction to consider Malinda's petition to adopt her son. Upon such consideration, the board possesses the authority to waive the requirement of a statutory parent in order to facilitate the proposed adoption, an adoption that no one associated with this case has ever denied is in the best interests of Baby Z.

C

As previously mentioned, there is another statutory route that Malinda may follow in order to formalize her relationship with her son. Despite a protracted analysis of the adoption statutes, the majority pays scant attention to § 45a-724 (a) (2) (B), pursuant to which the spouse of a biological parent may adopt a child born out of wedlock. Although the majority "recognize[s] that . . . § 45a-724 'shall be liberally construed in the

---

[33] *In re Angel Lace M.*, 184 Wis. 2d 492, 514–16, 516 N.W.2d 678 (1994).
[34] *In re Adoption of T.K.J.*, 931 P.2d 488, 494 (Colo. App. 1996).

best interests of [the] child,' " the majority's three sentence "analysis" of § 45a-724 (a) (2) (B) is bereft of liberal construction.[35] More specifically, the majority makes no effort to liberally construe the word "spouse" as it appears in that statute.[36]

As a term of art, "spouse" is the label applied to the person to whom one is legally married. It would be foolish, however, to suggest that this definition of the word exhausts the rich mine of its many meanings. Three justices of this court recognized in *Doe* v. *Doe*, 244 Conn. 403, 477–78, 710 A.2d 1297 (1998) (*Katz, J.*, with whom *Berdon* and *Peters, Js.*, joined, concurring in part and dissenting in part), that "[t]he traditional American nuclear family of a married couple and their own children has been subsumed by a range of alternatives. See *Michaud* v. *Wawruck*, [209 Conn. 407, 415, 551 A.2d 738 (1988)]. . . . 'Across the nation, state courts are reexamining the roles of biological ties and other relationships in the family. Courts consider those relationships against a background of new techniques, medical advances, and evolving life styles.' S. Pollack, 'The Art of Judging,' 71 N.Y.U. L. Rev. 591, 609 (1996); see, e.g., *Baehr* v. *Lewin*, 74 Haw. 530, 580, 852 P.2d 44 (1993) (because denial of marriage license to homosexual couple could constitute sex-based discrimination it must be reviewed subject to strict scrutiny under

[35] The majority flatly asserts that "the mandate of § 45a-706 that § 45a-724 be liberally construed was not intended to broaden the stepparent exception of § 45a-724 (a) (2) to include an otherwise unauthorized adoption agreement." This begs the question of whether adoption by Malinda is "authorized" according to a liberal construction of the word "spouse." It is this lacuna that I address in this part of my dissent.

[36] The majority merely explains that the word "spouse" in § 45a-724 replaced the more specific terms of art "the person with whom re-marriage shall be solemnized," "the person with whom such marriage or remarriage is contracted," and "the person to whom they are married." I fail to see the import of this explanation. If anything, the amendment tends to suggest that the legislature intended to displace the strict meaning of the terms that it struck from the earlier version of § 45a-724 with the more expansive connotations of the word "spouse."

state equal protection clause); *Bezio* v. *Patenaude*, 381 Mass. 563, 578, 410 N.E.2d 1207 (1980) (homosexuality does not render mother unfit custodian); *In re Baby M.*, 109 N.J. 396, 429–44, 537 A.2d 1227 (1988) (surrogacy contract rejected as conflicting with existing statutes and public policy of state); *In the Matter of Jacob*, [supra, 86 N.Y.2d 656] (unmarried companion, whether male or female, of child's biological mother can adopt mother's child). 'Brush stroke by brush stroke, state courts are painting a new portrait of the American family.' S. Pollack, supra, 613." Likewise, the word "spouse" takes on a more expansive meaning in our changing times. In terms of the ways in which people structure their lives and conduct their interpersonal relationships, your spouse is the person with whom you vow to share your life and raise your family. Although Malinda does not technically qualify as Anne's spouse under the former definition, it is clear that she is in fact Anne's spouse under the latter definition.[37]

Many of the same facts that demonstrate that allowing Malinda to adopt Baby Z. is in his best interests also demonstrate that Malinda is in fact Anne's spouse in every sense but the narrow one that she and Anne are unable to procure a marriage certificate. Most obviously, Malinda and Anne vowed more than one decade ago to share their lives together. Like any responsible spouse, Malinda helped plan for the birth of her son, and she partakes of all the joys and burdens of motherhood. The members of Malinda's extended family bestow both love and support upon her union with Anne, thus treating her as Anne's spouse. The fact that Baby Z. calls Malinda "Mama" strongly suggests that he regards Malinda as his mother and, correlatively, as Anne's spouse.

---

[37] Moreover, I presume that Malinda and Anne would formalize their marriage if there were enabling legislation.

It is important to focus upon the reason why a biological parent is authorized to give a child in adoption to the person whom § 45a-724 identifies as his or her "spouse." The touchstone in any adoption case is the best interests of the child. In effect, spousal status serves as a proxy for this touchstone. The fact that an adoptive parent has legally married a child's biological parent does not, however, guarantee that the adoptive parent will nurture the child to the greatest extent possible, or even that the adoptive parent will neither neglect nor abuse the child. Rather, the reliance upon spousal status reflects the legislature's belief that the spouses of biological parents tend to promote the best interests of their adopted children. This belief has little, if anything, to do with the legal consequences of marriage. Instead, it hinges on the simple proposition that the life partners of biological parents are likely to love and nurture the children of their mates. In the present case, recognizing that Malinda is in fact Anne's spouse achieves the result contemplated by § 45a-724—that is, the best interests of Baby Z. would be entrusted, in part, to the life partner of his biological mother.[38]

It is apparent that there are many contexts in which a generous interpretation of the word "spouse" would be inappropriate. It is equally apparent, however, that the legislative mandate to use the tool of liberal construction when the best interests of a child can be served thereby has singled out adoption for special treatment. In this context, the best interests of the child

[38] As previously discussed, § 45a-724 represents one portion of a statutory framework erected to advance "the public policy of the state against the obtaining of children by illegal means for adoption purposes." General Statutes § 45a-764 (g). Because the specter of black market adoptions has absolutely nothing to do with the present case, the liberal construction of the word "spouse" set out above does not contravene the legislative intent. Instead, it conforms to the express statutory mandate that § 45a-724 "shall be liberally construed in the best interests of [the] child . . . ." General Statutes § 45a-706.

compel us to emphasize the social connotations of the word "spouse" over the strict, lexicographical definition. It may well be that some cohabitants—whether heterosexual or homosexual—are not spouses. In the present case, however, the evidence is abundantly clear that Malinda is in fact Anne's spouse. Accordingly, Malinda should be allowed to adopt Baby Z. pursuant to § 45a-724 (a) (2) (B).

### III

The majority does not merely ignore the requirement of liberal construction and read the relevant statutes in a procrustean fashion in order to deny relief to the plaintiffs; it also refuses to review the plaintiffs' alternative claim that forbidding Malinda to formally adopt Baby Z. violates both equal protection and due process. The majority argues that the plaintiffs' constitutional claims cannot be raised in this appeal, but, rather, "must be raised in further proceedings before the Superior Court pursuant to their original probate appeal or in any subsequent appeal taken from a final judgment of that court denying their adoption application." This is incorrect for two reasons. First, while these issues were not reached by the trial court—either by Judge Austin in the original appeal from probate, or by Judge Handy in the appeal from the board's decision denying the Probate Court's application, on remand, for a waiver of the statutory parent requirement—the constitutional issues were *briefed by both the plaintiffs and the state of Connecticut* in both the trial court and this court. The state, in particular, devoted one half of one brief submitted to this court to these constitutional arguments. It is thus a question of law before this court, fully briefed by both the plaintiffs and the state, whether prohibiting Malinda from adopting Baby Z. violates the constitutional rights of either the plaintiffs or their child. Indeed, as the majority acknowledges, this court granted the plaintiffs' motion "to file a late preliminary

statement of issues in order to raise their constitutional claims as alternate grounds for affirmance . . . ." I am unable to comprehend how in the world the majority can reconcile our decision to allow the plaintiffs to raise their constitutional issues with its refusal to consider those issues.

Second, the majority's contention misses the mark. Because statutory construction is informed by the presence of constitutional infirmities, this court reads statutes "so as to avoid, rather than to create, constitutional questions." *In re Valerie D.*, 223 Conn. 492, 534, 613 A.2d 748 (1992). More specifically, "[i]n choosing between two statutory constructions, one valid and one constitutionally precarious, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Internal quotation marks omitted.) *In re Baby Girl B.*, 224 Conn. 263, 286, 618 A.2d 1 (1992). By refusing to acknowledge the unconstitutional consequences of the decision it renders today, the majority performs an end run around this basic axiom of statutory construction. Because the majority's construction is constitutionally "precarious," the court should have recognized that the legislative intent in this case—promoting Baby Z.'s best interests—compels us to prefer a reasonable construction of the relevant statutes that facilitates, rather than frustrates, the proposed adoption.

Because this court granted the plaintiffs permission to raise their constitutional issues, because these issues were fully briefed and argued, and because principled statutory construction requires consideration of these issues, I can only conclude that the majority purposefully avoids discussing the constitutional consequences of its decision today in order to deny relief to Baby Z. and his family. Indeed, by refusing to reach the constitutional issues, the majority of this court violates the due process rights of Baby Z., Malinda and Anne.

A

Requiring Anne to terminate her parental rights as the biological mother of her son in order to promote Baby Z.'s best interests would violate her due process rights under both the federal and state constitutions.[39] The relationship between a mother and her child is one of the most fundamental liberty interests protected by the constitution. *Castagno* v. *Wholean*, 239 Conn. 336, 342, 684 A.2d 1181 (1996) ("[the] right [of the parents to determine the care, custody, and control of their children] is recognized because it reflects a strong tradition founded on the history and culture of Western civilization, and because the parental role is now established beyond debate as an enduring American tradition" [internal quotation marks omitted]). The United States Supreme Court has emphasized that "[c]hoices about marriage, family life, and the upbringing of children are among the associational rights [the] Court has ranked as of basic importance in our society . . . rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." (Citation omitted; internal quotation marks omitted.) *M. L. B.* v. *S. L. J.*, 519 U.S. 102, 116, 117 S. Ct. 555, 136 L. Ed. 2d 473 (1996); see *Quilloin* v. *Walcott*,

[39] If Anne were to terminate her rights to her biological son, the following sequence of events would ensue: (1) a statutory parent would be appointed; (2) that statutory parent might elect to place Baby Z. with Anne and Malinda; and (3) if so, Anne and Malinda might then attain legal status as the adoptive parents of Baby Z. Although a statutory parent well might place Baby Z. with Anne and Malinda, this is by no means a foregone conclusion. It is, however, beyond question that the procedure I have identified would require Anne to endure the enormous trauma and degradation of terminating her rights to her biological son. It is presumably for these reasons that Anne elected to retain her legal rights as Baby Z.'s mother and endure this litigation, rather than terminate her rights and place her hopes and dreams about her family in the discretion of a potentially homophobic statutory parent, who is authorized by statute to "consider the sexual orientation of the prospective adoptive . . . parents when placing a child for adoption . . . ." General Statutes § 45a-726a.

434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1987) ("the relationship between parent and child is constitutionally protected"). This court has made it clear that this due process protection of family integrity "is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. *Moore* v. *East Cleveland*, 431 U.S. 494, 504, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977); and see *Michaud* v. *Wawruck*, [supra, 209 Conn. 415]; *In re Theresa S.*, 196 Conn. 18, 31, 491 A.2d 355 (1985)." (Internal quotation marks omitted.) *Lehrer* v. *Davis*, 214 Conn. 232, 239, 571 A.2d 691 (1990).

The robust protection of family integrity recognized by both this court and the United States Supreme Court establishes that the relationship between Baby Z. and his two mothers is of constitutional magnitude. For this reason, substantive due process embraces Anne and Malinda's desire to raise Baby Z. in a family environment that is most likely to promote his best interests. More specifically, it embraces their desire to raise their son with two coequal mothers, each of whom is fully recognized in the eyes of the law. It also precludes the state from conditioning such an arrangement upon Anne's willingness to terminate all of her constitutionally protected rights to her biological son.

At the core of the concept of due process is the principle that "the government may not require a person to give up a constitutional right in exchange for a discretionary benefit conferred by the government where the [condition] has little or no relationship to the [benefit]." *Dolan* v. *Tigard*, 512 U.S. 374, 385, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994). The benefit sought in this case, which consists of permitting Malinda to formally adopt Baby Z., bears no nexus whatsoever to the condition imposed: requiring Anne to terminate her constitutionally protected relationship with her biological son before she and her life partner may be eligible to adopt him. In fact, the condition is heartbreakingly useless

for precisely the same reason that the benefit is so important: Anne loves her son and wants to do everything within her power to promote his best interests. Accordingly, the statutory construction urged by the majority cannot withstand constitutional scrutiny.[40]

It would be irresponsible to ignore the fact that Baby Z. will, throughout his life, be victim to the virulent homophobia that exists in the society into which he was born. It would be cruel to deny him the protection and the solace associated with belonging to a family that the law recognizes as valid. It would be enormously traumatic and degrading for Anne to sacrifice her legal rights as her son's biological mother in order to protect him.[41] For the reasons previously discussed, I am persuaded that these burdens would also violate due process.

B

The interpretation of the statute advanced by the majority is also repugnant to the concept of equal protection embodied in both the United States and Connecticut constitutions. The United States Supreme Court has emphasized that it is "illogical and unjust" to punish children based upon the marital status of their parents. *Weber* v. *Aetna Casualty & Surety Co.*, 406 U.S. 164, 175, 92 S. Ct. 1400, 31 L. Ed. 2d 768 (1972); see *Weidenbacher* v. *Duclos*, 234 Conn. 51, 70, 661 A.2d 988 (1995) ("[s]ociety has come to recognize that discrimination against [children born out of wedlock] is not justified" [internal quotation marks omitted]). Because children "can affect neither their parents' conduct nor their own status"; (internal quotation marks

---

[40] Moreover, the state gains nothing by obstructing Malinda's adoption of her son, whereas the testimony adduced at trial overwhelmingly demonstrates that Baby Z. will suffer unless the law recognizes Malinda as his mother.

[41] See footnote 39 of this dissent.

omitted) *Plyler* v. *Doe*, 457 U.S. 202, 220, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982); "imposing disabilities on [a child born out of wedlock] is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing." *Weber* v. *Aetna Casualty & Surety Co.*, supra, 175. In this case, not even Anne and Malinda can affect their status, because they cannot marry under Connecticut law.

It is beyond question that the majority's interpretation of the statutory scheme inflicts an "illogical and unjust" punishment on children like Baby Z. for the sole reason that their parents are not married. According to the majority, unmarried parents[42] must choose between Scylla and Charybdis; they cannot avoid both. On the one hand, many unmarried parents will be deterred from formalizing their relationships with their children because of the enormous trauma, degradation and uncertainty associated with the termination of parental rights.[43] This decision will harm their children. As previously discussed, Professor Nordhaus testified that children who are not adopted by their parents "[do] not develop their optimum potential . . . [and are] left with a feeling of being 'unwanted' and thereby [are] developmentally deprived." *In re Baby Z.*, supra, 45 Conn. Sup. 36. On the other hand, because children are extremely sensitive to disturbances in their households, they will also suffer if their biological parents elect to endure the pains of termination. Married parents need not grapple with this Hobson's choice.

In addition, the majority's interpretation discriminates against Anne because she is not married to Malinda. "[T]he concept of equal protection [under both the

[42] I intend the term "unmarried parents" to refer to a biological parent sharing his or her life with a partner who is *not* the other biological parent of the child and to whom the biological parent is not married. Neither gender nor sexual orientation is relevant to this definition.

[43] See footnote 39 of this dissent.

state and federal constitutions][44] has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. *Reynolds* v. *Sims*, 377 U.S. 533, [565] 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964); *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, [440] 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985); *Daily* v. *New Britain Machine Co.*, 200 Conn. 562, 578, 512 A.2d 893 (1986). The equal protection clause does not require absolute equality or precisely equal advantages. *Ross* v. *Moffitt*, 417 U.S. 600, [612] 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974); *Daily* v. *New Britain Machine Co.*, supra, 577–78. Rather, a state may make classifications when enacting or carrying out legislation, but in order to satisfy the equal protection clause *the classifications made must be based on some reasonable ground. Ross* v. *Moffitt*, supra, [612]; *Magoun* v. *Illinois Trust & Savings Bank*, 170 U.S. 283, [293] 18 S. Ct. 594, 42 L. Ed. 1037 (1898); *Daily* v. *New Britain Machine Co.*, supra [577–78]; *State* v. *Reed*, [192 Conn. 520, 531, 473 A.2d 775 (1984)]." (Emphasis added; internal quotation marks omitted.) *State* v. *Metz*, 230 Conn. 400, 423, 645 A.2d 965 (1994).

Requiring Anne to terminate her parental rights to Baby Z. before permitting the proposed adoption constitutes a denial of equal protection because it discriminates against an unmarried biological parent without any grounds whatsoever, let alone the requisite reasonable grounds.[45] Under the majority's reading of the statutory scheme regulating adoptions in Connecticut, Anne

[44] Article first, § 20, of the constitution of Connecticut, as amended by article twenty-first of the amendments, provides in pertinent part: "No person shall be denied the equal protection of the law nor be subjected to . . . discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

[45] This conclusion comports with General Statutes § 45a-727 (c) (3), which provides in part that adoption decrees are not to be denied "solely because of an adopting parent's marital status . . . ." At least three of our sister

may not share legal custody of her son with her life partner unless she first endures the enormous trauma, degradation and uncertainty associated with terminating all of her legal rights to her child.[46] Married parents, in contrast, do not suffer this disability.

This disparity makes no sense. The evidence is clear that the best interests of the child, in general, and of Baby Z., in particular, are promoted when both parents share legal custody. The absence of a marriage certificate does not alter this fact, particularly in cases such as this one where the two parents have so clearly committed their lives to one another and to their child. Neither the state nor the majority has advanced any justification for visiting a grave sanction upon an unmarried parent such as Anne, and for good reason: the classification is wholly irrational. Accordingly, it violates equal protection.[47]

## IV

An enormous amount of ink has been expended on this case. The complexity of this case, however, is not

states have also rejected the proposition that a biological parent's rights must be terminated before a coparent may adopt. See *In re M.M.D.*, supra, 662 A.2d 859–60; *In the Matter of Jacob*, supra, 86 N.Y.2d 656; *In re B.L.V.B*, supra, 160 Vt. 372–73.

[46] See footnote 39 of this dissent.

[47] This equal protection analysis does not depend upon the fact that Anne's life partner is female. Even if Anne shared her life with a man who was not Baby Z.'s father, she would not be permitted to share legal custody of her son with him unless one of two conditions were first satisfied: either (1) she married him or (2) she terminated her parental rights to her biological child. Accordingly, the majority's interpretation of the statutory scheme violates the equal protection rights of all biological parents—irrespective of either gender or sexual orientation—who share their lives with partners to whom they are not married (and who are *not* the children's other biological parents).

Nevertheless, it is not insignificant that Malinda is a woman. Although all unmarried parents may have compelling reasons for avoiding matrimony, the fact that Anne and Malinda are both female means that they are *prohibited* to marry in this state. For this reason, even if the availability of same-sex marriage could save the statutory scheme from constitutional infirmity

commensurate with the length of our writings. The majority's only substantive argument boils down to the following paradox: the board possesses the authority to waive every significant aspect of the requirement of a statutory parent, but it can only exercise this authority if a child already has a statutory parent. More specifically, the majority claims that the board may waive the vitally important duties of a statutory parent, but can *not* waive the technicality that a statutory parent perform the perfunctory clerical task of filing some paperwork with the Probate Court. This is so, the majority maintains, notwithstanding the fact that waiving the placement requirement obviates any conceivable need for a statutory parent, because the board may only grant a waiver if it first determines—after conducting an evidentiary hearing—that the adoption is in the best interests of the child.

My position is also straightforward, and can be summarized in a few sentences. It is undisputed that the best interests of Baby Z. will be promoted if Malinda is permitted to adopt him. The plain language of the statutory scheme permits this adoption. Even if this conclusion were incorrect, this court must engage in liberal construction of the statutory scheme in order to promote the best interests of Baby Z. Either way, there are two procedural routes by which the proposed adoption may be accomplished: (1) the board may waive the requirement of a statutory parent; or (2) Anne (as a biological mother) may give her son in adoption to Malinda (as her spouse). The majority's misreading of the plain meaning of the relevant statutes—coupled with its refusal to (1) engage in liberal construction pursuant to the legislative mandate of § 45a-706, (2) acknowledge the well settled common-law rule that remedial statutes must be liberally construed, or (3)

---

—which I cannot believe is true—marriage is not an option for Anne and Malinda.

defer to either the legislative history or the state's own interpretation of the relevant language—creates grave violations of both due process and equal protection, constitutional issues that the majority also refuses to consider.

In conclusion, I would affirm the trial court's judgment and remand the case to that court with direction to remand the case to the board to waive the requirement of a statutory parent in order to approve Malinda's adoption of Baby Z. pursuant to § 45a-764 (a). In the alternative, I would remand this case to the trial court with direction to remand the case to the Probate Court in order to permit Anne to give Baby Z. in adoption to Malinda, as her spouse, pursuant to § 45a-724 (a) (2) (B).

Accordingly, I dissent.[48]

---

[48] In a lengthy discussion at the end of its opinion, the majority struggles to either dodge or deflect the force of my dissent. I feel that I have addressed adequately the majority's efforts to poke holes in my arguments. Nevertheless, I will in the interest of clarity address these claims once again, in the order in which they have been raised.

First, the majority either misunderstands or misrepresents a number of the arguments contained in this dissent. I do not, for example, "impliedly assert" that § 45a-764 "provide[s] that the board may . . . waive any and all requirements set forth in the adoption statutes . . . ." (Internal quotation marks omitted.) I merely assert the following two propositions: (1) § 45a-764 means what it says it does—the board may waive the requirement of a statutory parent and (2) when read in conjunction with § 45a-764, the language of § 45a-724 underscores this conclusion. In my view, the plain meaning and legislative history of the relevant statutes support these conclusions; even if this were not the case, it is beyond dispute that a liberal construction compels them.

Second, far from "contraven[ing] the expressed intent of the legislature," I am merely unwilling to disregard the unambiguous and unmistakable intent of the legislature by ignoring the mandate of § 45a-706 that the relevant statutes (i.e., §§ 45a-724 and 45a-727) "shall be liberally construed in the best interests of [the] child." General Statutes § 45a-706. Furthermore, I am unable to comprehend how the majority could possibly reconcile its concession that "remedial statutes . . . are subject to liberal construction" under the common law with its refusal to liberally construe § 45a-764. I am, moreover, baffled by the majority's use of the term "*our* liberal construction of the statutory terms . . . ." (Emphasis added.) As I have indicated, the opinion of the majority is bereft of liberal construction.

Third, I am unable to perceive the "convolut[ion]" required to support the thesaural observation that the words "give" and "place" are synonymous. Nor do I comprehend how compliance with the legislative mandate of liberal construction could possibly "[outstrip] the expressed intent of the legislature." It is rather the majority's refusal to engage in liberal construction that finds "no principled basis . . . ."

The majority accuses me of "stretch[ing] the statutory language . . . ." As discussed in part II B of this dissent, a liberal construction requires us to "[expand] the meaning of [a] statute to meet cases which are clearly within the spirit or reason of the law . . . ." (Internal quotation marks omitted.) Accordingly, stretching the language of the adoption statutes would be authorized, if it were necessary. The majority's tactic of amputating the statutory language and ignoring the dual mandate of liberal construction, however, can not be justified by any principle of law or logic. Because a liberal construction "expands the meaning of the statute"; Black's Law Dictionary (6th Ed. 1990); the fact that the plaintiffs acknowledge that the words "place" and "give" may be used to describe distinct steps in the adoption process cannot defeat my argument that a liberal construction of the word "give" as it appears in § 45a-724 places the requirement of a statutory parent within the orbit of the waiver provision of § 45a-764.

Fourth, the majority's claim that it is "patently incorrect" to argue that a child who comes before the board acquires "no additional quantum of protection" by having a member of that board appointed as a statutory parent is, itself, patently incorrect. The majority states that "the statutory parent is required to perform an investigation and report to the Probate Court . . . ." The board—which consists of representatives from the Probate Court and from the only two agencies from which a statutory parent may be appointed—performs its own investigation, in the form of an extensive evidentiary hearing. In addition, the board could order a social worker to perform a field investigation and testify before the board. The majority has neither denied that the board possesses this inherent authority nor provided any reason to doubt that it does. Furthermore, instead of merely reviewing a cold report, the Probate Court administrator—in his or her capacity as a member of the board—personally evaluates the credibility of the witnesses who testify at the hearing. For these reasons, a child such as Baby Z. gains no quantum of protection from the appointment of a statutory parent.

The majority accuses me of "denigrat[ing] the vital roles" of the statutory parent and the Probate Court. This claim paints with too broad a brush. It is my view that *a child such as Baby Z.* gains nothing from the appointment of a statutory parent, for the reasons discussed above. Accordingly, Baby Z. has no need of a statutory parent, although other children might require the termination of parental rights that is associated with the appointment of a statutory parent. Nor does anything that I have said undermine the role of the Probate Court. As I have discussed, § 45a-764 (b), (e) and (f) clearly vest ultimate authority to approve the merits of the proposed adoption in the Probate Court. See footnote 25 of this dissent. Accordingly, I have not

"denigrate[d]" the prominent role of the Probate Court. (The majority raises in the fourth paragraph of part II D of its opinion a point with respect to § 45a-764 (f) that it also raises in the eighth paragraph of that part. In the interest of clarity, I consolidate this redundancy by addressing this point below.)

Fifth, no "linguistic sleight of hand" is required to support the observation that the plain meaning of § 45a-764 incorporates the definition of a statutory parent. As I have mentioned, the language of the waiver provision of § 45a-764 quotes verbatim from the definition of a statutory parent contained in General Statutes § 45a-707 (f). See footnote 19 of this dissent. Throughout its opinion, the majority appears to share my understanding of § 45a-764. On at least four separate occasions, the majority emphasizes that the waiver provision of § 45a-764 applies only to statutory parent adoptions. Nevertheless, in one of its final paragraphs, the majority suddenly decides that § 45a-764 does *not* refer to statutory parent adoptions, but rather refers to entities who could be—but have not been—appointed by the court as statutory parents. The majority's hands are quicker than my eye; I find this abrupt shift entirely mysterious.

Section 45a-764 (a) provides in part that the board "may . . . waive the requirement that the minor child be placed by the commissioner of children and families or a child-placing agency." The majority strains to make much of the fact that this waiver provision does not contain four words— "appointed by the court"—that appear in the definition of the term "statutory parent" set forth in § 45a-707 (f). As a matter of both semantics and basic grammar, however, the absence of these four words suggests that § 45a-764 refers to all child-placing agencies and the commissioner, whether or not an agency or the commissioner has been appointed by the court as a statutory parent. In the language of Venn diagrams, the entire universe of child-placing agencies (plus the commissioner) referred to in § 45a-764 may be represented by a large circle that contains within it the smaller circle of those agencies (plus the commissioner) appointed by the court to serve as statutory parents. Accordingly, it is proper—for purposes of this case—to observe that § 45a-764 (a) provides that the board "may . . . waive the requirement that the minor child be placed by [a statutory parent]."

Moreover, the majority seems to believe that I want to deny that § 45a-727 (a) refers to a statutory parent. Of course it refers to a statutory parent. Section 45a-764 authorizes the board to waive the requirement of a statutory parent and § 45a-727 (a) (3) cross-references this waiver. More specifically, § 45a-727 (a) (3) provides that the Probate Court shall not accept an application for the adoption of a minor child not related to the adopting parents unless (1) the child sought to be adopted has been placed for adoption by a statutory parent, or (2) the placement requirements of this section have been waived by the board as provided in § 45a-764. It could not be any clearer that both §§ 45a-727 and 45a-764 refer to a waiver of the requirement of a statutory parent.

The majority incorrectly concludes that § 45a-727 (a) mandates that a

statutory parent must be appointed before a child may be placed with adoptive parents. There is simply no language in § 45a-727 that supports this contention. As discussed above, § 45a-727 (a) requires one of two alternatives: *either* the child must be placed by a statutory parent *or* this requirement must be waived by the board. General Statutes §§ 45a-727 (a) (3) and 45a-764. Accordingly, placement by a statutory parent is required only in the absence of a waiver.

Sixth, turning yet again to my observation that the words "give" and "place" are synonymous, the majority maintains that we should ignore the regulations promulgated by the department of children and families to define the terms "[p]lace for adoption" and "placement for adoption." As discussed in part II B of this dissent, § 45a-728-2 (h) of the regulations defines the word "place" as "the act of giving . . . ." As the majority acknowledges, " '[a]n identical term used in [statutory provisions] pertaining to the same subject matter should not be read to have differing meanings unless there is some indication from the legislature that it intended such a result.' " The majority has not indicated any legislative history instructing us to disregard the definition offered by the department of children and families. Even if my reliance upon the department of children and families as my lexicographer were misplaced, the majority does not attempt to deny that the words "give" and "place" are synonymous, particularly when they are subjected to liberal construction.

Seventh, the majority does not deny that § 45a-724 (a) (2) (B) is subject to the express legislative mandate of liberal construction. Accordingly, it is a contradiction in terms to assert that the word "spouse" as it is used in that provision "continues to mean 'spouse' *as traditionally defined.*" (Emphasis added.) By definition, a liberal construction *expands* the traditional meanings of words. It hardly "violate[s] clearly expressed legislative intent" to comply with the legislature's mandate of liberal construction. Significantly, the majority has not identified any legislative history that tends to suggest that any legislator ever expressed—clearly or obliquely—that we should not regard a life partner such as Malinda as the spouse of a biological mother.

Eighth, the majority's effort to refute my arguments by recourse to legislative history is unavailing. As a threshold matter, I want to emphasize that the majority has not identified one line of legislative debate that tends to suggest that any legislator ever specifically considered an adoption such as the one proposed by the Anne and Malinda, let alone specifically stated that such an adoption must be denied. As I have demonstrated, the legislative history supports my view that the board may waive the requirement of a statutory parent. See footnote 32 of this dissent and the accompanying text. Moreover, § 45a-706 expressly mandates that many of the statutes regulating adoption "shall be liberally construed in the best interests of [the] child . . . ." The majority ignores this compelling evidence of the intent of the legislature.

The majority claims that legislative history supports its contention that

the legislature never intended to provide the board with jurisdiction to waive the statutory parent requirement of § 45a-724 (a). This claim is incorrect both legally and factually. As a matter of rudimentary jurisprudential theory, the inferences that the majority has derived from the legislative history— even if they were valid—could not trump any of the following: (1) the plain language of § 45a-764; see *Rizzo Pool Co.* v. *Del Grosso*, 240 Conn. 58, 74, 689 A.2d 1097 (1997) (" '[w]hen the language of a statute is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent' "); (2) the well settled common-law principle that remedial statutes must be liberally construed; see, e.g., *Dysart Corp.* v. *Seaboard Surety Co.*, supra, 240 Conn. 18; or (3) the legislature's express mandate that §§ 45a-724 and 45a-727 must be liberally construed. See General Statutes § 45a-706. In any event, the legislative history suggests only that, by amending § 45a-724 with respect to blood relatives, the legislature intended to relieve blood relatives of the need to go to the board for a waiver of the requirement of a statutory parent; it does not suggest that the requirement of a statutory parent cannot be waived. In other words, the amendment represents a legislative judgment that it is not necessary to have the board determine that an adoption by a blood relative (1) is in the best interests of the child, and (2) is not a black market adoption. This makes sense: more oversight is required when children are placed with unrelated persons than when they are placed with blood relatives. In the latter circumstance, the legislature rightly presumes that prospective parents love those children to whom they are related by blood, and that being placed in loving environments promotes the best interests of children.

Despite the majority's decision to make the identical point twice in part II D of its opinion, it is not particularly earth-shattering that—once the board has decided to waive the requirement of a statutory parent—§ 45a-764 (f) "directs that . . . the Probate Court shall include in the adoption decree a finding that *the placement requirement* of § 45a-727 has been waived," but does *not* provide that the decree must include a finding that the requirement of a statutory parent has been waived. (Emphasis added.) As discussed above, § 45a-727 requires either a statutory parent or a waiver of the requirement of a statutory parent contained in § 45a-724. Accordingly, the legislature had no reason to "[direct] the Probate Court . . . to include in its decree a finding that the statutory parent requirement of § 45a-724 (a) has been waived." Because this is precisely what it means to waive "the placement requirements of § 45a-727," it would have been redundant to have required reference to both §§ 45a-727 and 45a-724.

Lastly, the majority cannot deny that the legislative history surrounding the enactment of § 45a-764 does not contain any reference to either of its two purportedly "unwaivable" requirements. Nor can the majority dispute the fact that Judge Knierim and others repeatedly stated—in very general terms—that the waiver provision was intended to remedy the inequities created by the strict requirements of the adoption statutes. See footnote 32

of this dissent and the accompanying text. Instead, all that the majority can do is attempt to bend a single line of my argument into a circle. I have explained at length why the statutory terms "commissioner" and "child-placing agency" may, for present purposes, be replaced by the term "statutory parent." For the same reason, the identical substitution may be made in the legislative history. Even if this argument were circular, the majority would still have to provide some evidence for its purported requirements and refute the legislative history that I have marshaled. The majority has done neither.

Notwithstanding the claims of my colleagues, I have deferred to the intent of the legislature as that intent has been expressed in the clear language of § 45a-706: this court must engage in liberal construction in the best interests of the child. I find it ironic that the same majority that pays so much lip service to deferring to legislative intent refuses to engage in the liberal construction that the legislature has so plainly required. Presumably, this refusal finds its roots in the majority's inability to devise a liberal construction of the relevant statutes that prohibits the proposed adoption.

In *In re Bruce R.*, supra, 234 Conn. 194—which involved heterosexual parents—the majority functionally redrafted the relevant statute. In the present case—which involves lesbian parents—the majority has refused to even engage in liberal construction. The majority fails to account for this radical disparity on the basis of principle. In a phrase that three members of the majority have recently used in a different context, I believe that the court's decision is "result driven." *Sheff* v. *O'Neill*, supra, 238 Conn. 55 (*Borden, J.*, with whom *Callahan* and *Palmer, Js.*, joined, dissenting).